UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

}
JUANA BAEZ, Individually and on behalf                }
of all others similarly situated,                             }
CRUZ SANABRIA, Individually and on behalf      }
of all other similarly situated,                              }
ROGELIO RODAS, Individually and on behalf     }
of all others similarly situated,                             }
DEMETRIUS OVIEDO, Individually and on         }
behalf of all others similarly situated                     }
                                                                            }
                          Plaintiffs                                 }
                                                                            }
v.                                                                         }
                                                                            }
TOWN OF BROOKLINE, MASSACHUSETTS,        }
BROOKLINE POLICE COMMISSIONERS,             }
NEIL WISHINSKY,                                             }
In his Individual and Official Capacities,                  }
NANCY DALY,                                                   }
In her Individual and Official Capacities,                  }
BEN FRANCO,                                                   }
In his Individual and Official Capacities,                  }
NANCY HELLER,                                                }
In her Individual and Official Capacities,                  }
BERNARD GREENE,                                            }
In his Individual and Official Capacities                   }
                                                                            }
                          Defendants                                }
_____  }

## **CLASS ACTION COMPLAINT AND JURY DEMAND**

1.     Juana Baez, Cruz Sanabria, Rogelio Rodas, and Demetrius Oviedo bring this

action against the Town of Brookline ("Brookline" or "Town") on behalf of themselves and

others similarly situated to vindicate their Fourteenth Amendment right to equal protection and

freedom from racial discrimination.  They have been damaged by Brookline's custom, policy,

and practice of targeting Black and Hispanic people for unwarranted criminal charges, criminal investigations, and threats of criminal charges, while failing to investigate and enforce the criminal law equally against white people (the "Policy"). The purpose and effect of the Policy is to grant white people special status and to subordinate Black and Hispanic people in Brookline. The Policy violates the Fourteenth Amendment's guarantee of equal protection of the laws.

## PARTIES

2.      Plaintiff Juana Baez is a resident of Brookline.  Ms. Baez is of Dominican ancestry.  Ms. Baez is Hispanic.

3.      Plaintiff Cruz Sanabria is a resident of Brookline.  Mr. Sanabria is of Puerto Rican ancestry.  Mr. Sanabria is Hispanic.

4.      Plaintiff Rogelio Rodas is a resident of Brookline.  Mr. Rodas is of Guatemalan ancestry.  Mr. Rodas is Hispanic.

5.      Plaintiff Demetrius Oviedo is a resident of Brookline.  Mr. Oviedo is Hispanic.

6.      Defendant Town of Brookline is a duly organized town in the Commonwealth of Massachusetts.   Brookline has a town meeting form of government, headed by an elected five-member Board of Selectmen.  The Board of Selectmen are the chief elected and executive officers of the Town, with overall responsibility for supervising Town affairs.  Brookline operates under a so-called "weak chief" charter, and the Selectmen serve as the Police Commissioners for the Town.  The Selectmen are responsible for approving Police Department policies.  They are the ultimate decision-makers with respect to the hiring, firing, promotion, demotion, and discipline (Selectmen must approve suspensions longer than 5 days) of Brookline police officers.  The Selectmen have the authority to hire and fire the town administrator, the town counsel, the director of human resources, and the police chief.

7.     Defendant Neil Wishinsky has been a Brookline Police Commissioner since May 2013.  Mr. Wishinsky was elected chair of the Brookline Board of Selectmen on May 12, 2015.  Mr. Wishinsky is white.  Mr. Wishinsky is a resident of Brookline.

8.     Defendant Nancy Daly has been a Brookline Police Commissioner since May 2005.  Ms. Daly is white.  Ms. Daly is a resident of Brookline.

9.     Defendant Ben Franco has been a Brookline Police Commissioner since May 2014.  Mr. Franco is white.  Mr. Franco is a resident of Brookline.

10.     Defendant Nancy Heller has been a Brookline Police Commissioner since May 2015.  Ms. Heller is white.  Ms. Heller is a resident of Brookline.

11.     Defendant Bernard Greene has been a Brookline Police Commissioner since May 2015.  Mr. Greene is Black.  Mr. Greene is a resident of Brookline.

## JURISDICTION

12.     This action is brought pursuant to 42 U.S.C. §§ 1981, 1983, 1985 and 1988 and the First and Fourteenth Amendment of the United States Constitution. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction under 28 U.S.C. § 1367.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b), because the events giving rise to the claims occurred in this district.

## ALLEGATIONS

### *The Town Has a Custom, Policy, and Practice of Racially Discriminatory Policing*

14.     The Town of Brookline has a custom, policy, and practice of targeting Black and Hispanic people for unwarranted criminal charges, criminal investigations, and threats of

criminal charges while failing to investigate and enforce the criminal law equally against white people (the "Policy").

15.     The Town of Brookline impermissibly uses race to determine whether to stop and question an individual, whether to investigate a crime, whether to apply for a criminal complaint and request a magistrate's hearing, whether to apply for a criminal complaint and request a summons, and whether to make an arrest.

16.     The Town of Brookline authorizes the police department to use its authority to treat Black and Hispanic people more harshly than white people at each stage in the criminal process.

17.     The Town of Brookline authorizes the police department to use its authority to treat white people more favorably than Black and Hispanic people at each stage in the criminal process.

18.     The Town of Brookline keeps statistics on racial disparities in stops and criminal charges which demonstrate that Black and Hispanic people are disproportionately subjected to criminal process compared to their presence in Brookline, neighboring communities, and the state.

19.     The Town of Brookline is on notice that Black and Hispanic people have long complained about unequal treatment by the police in Brookline.

20.     The Town of Brookline does not investigate the cause of racial disparities in policing and does not hold hearings to adjudicate specific complaints of discriminatory policing.

21.     The Board of Selectmen, as Police Commissioners, adopted Citizen Complaint procedures regarding complaints against the police "so that, as the final policy maker, it would be informed and could investigate, consider and act upon such complaints."

22.     The Police Commissioners do not follow the Citizen Complaint procedures. Notwithstanding that it is a requirement of the Citizen Complaint procedures, the Police Commissioners do not hold hearings on complainants' appeals from police internal investigation findings.  The Police Commissioners are on notice of the Policy and either purposefully enforce it or act in reckless disregard of its consequences.

### The Town Polices Black and Hispanic People More than White People

23.     The Brookline police department provides an annual report to the Police Commissioners which includes the racial composition of arrests, field contacts, and citizen complaints against the police.

24.     Between 2012 and 2016, the Brookline police reportedly made 3,643 arrests with white people accounting for just 40.6% of all arrested persons, despite comprising, according to the 2010 census, 76.6% of the population in Brookline, 82.3% of the population in Newton, 53.9% of the population in Boston, and 80% of the population in Massachusetts.  Newton and Boston are the municipalities that border Brookline.

25.     Between 2012 and 2016, the Brookline police reportedly made 3,643 arrests with Black and Hispanic people accounting for 51.6% of all arrested persons, despite comprising only 8.4% of the population in Brookline, 6.6% of the population in Newton, 41.8% percentage of the population in Boston, and 16.2% of the population in Massachusetts.

26.     Between 2012 and 2014, the police department defined "field interviews" to include "people who were stopped and questioned for suspicious or nuisance activity, town by-law violations and/or interviewed as part of an investigation."  The department described "field interviews" as "an excellent tool for police officers to identify possible suspects involved in

criminal activity and communicate the information to all officers through our in house Field
Interview Tracking System."

27.     Between 2012 and 2014, the police reportedly conducted 6,873 field interviews,
with white people accounting for just 59% of all field interviews, despite comprising 76.6% of
the population in Brookline, 82.3% of the population in Newton, 53.9% of the population in
Boston, and 80% of the population in Massachusetts.

28.     Between 2012 and 2014, the police reportedly conducted 6,873 field interviews,
with Black and Hispanic people accounting for 33% of all field interviews, despite comprising
only 8.4% of the population in Brookline, 6.6% of the population in Newton, 41.8% of the
population in Boston, and 16.2% of the Massachusetts population.

29.     In the 2015 report, for the first time, the police department stated that the category
of "field interviews" included two sub-categories: "field contacts" and "field interrogations."
The department defined "field contacts" to include "those individuals who the police encounter
during the normal course of conducting routine police services that we need to identify."  The
department defined "field interrogations" to include "individuals stopped by the police whom the
police or citizens believe to be acting suspiciously and rise to the level of suspicion that they
have, are or are about to commit a criminal offense."

30.     Although the police department had previously reported conducting over 2,000
"field interviews" per year going back to 2012, the department reported only 76 "field
interrogations" occurring in 2015 and did not report on "field contacts" at all.  In effect, the
department stopped reporting on the race of thousands of individuals "encountered" by the
police, including individuals whose information was entered into the department's Field

Interview Tracking System.  Upon information and belief, many of these "encounters" implicate the Fourth Amendment.

31.    In 2015 and 2016, the police reportedly conducted 123 "field interrogations," with white people accounting for just 40.6% of those "stopped and questioned for suspicious activity," despite comprising 76.6% of the population in Brookline, 82.3% of the population in Newton, 53.9% of the population in Boston, and 80% of the population in Massachusetts.

32.    In 2015 and 2016, out of 123 reported "field interrogations," Black and Hispanic people accounted for 51.2% of those "stopped and questioned for suspicious activity," despite comprising only 8.4% of the population in Brookline, 6.6% of the population in Newton, 41.8% of the population in Boston, and 16.2% of the population in Massachusetts.

### The Town Applies the Criminal Law Unequally According to Race

33.    On April 29, 2007, the Brookline police informed Arthur Conquest, a Black man, that he was being charged with criminal assault and banned him from town hall for standing his ground when a white town official, Lawrence Kaplan, walked up to him, yelled at him, and pointed his finger in his face after a public meeting.  Mr. Kaplan focused his attention on Mr. Conquest after Mr. Conquest objected to Mr. Kaplan yelling at a woman who had objected to a decision by Mr. Kaplan.  When Mr. Conquest did not back down from Mr. Kaplan, Mr. Kaplan instructed town staff to call the police.  The police officer who first encountered Mr. Conquest in town hall confronted him aggressively, backing him against the wall and yelling at him, according to multiple witnesses.  Without hearing Mr. Conquest's side of the story, the Brookline police applied for a criminal complaint against Mr. Conquest under G.L. c. 265, Section 13A despite the absence of probable cause to support the charge.  The officer who recommended the criminal charge, Sgt. Paul Campbell, was the nephew of the town official,

Lawrence Kaplan.  The charges and the town hall ban were quickly dropped after Mr. Conquest indicated his intent to apply for a cross-complaint against Mr. Kaplan for assault.  No criminal investigation was conducted into Mr. Kaplan's conduct.  The Police Commissioners denied Mr. Conquest's request for a hearing on his complaint of racial bias, rudeness, and discourtesy against the police officers who detained and charged him.  No public apology was ever made to Mr. Conquest, and the Police Commissioners accepted a report of the incident that indicated that the charges against Mr. Conquest were justified.  The Police Commissioners subsequently promoted Sgt. Campbell to Lieutenant, and the chief appointed Sgt. Campbell to head the internal affairs department charged with investigating citizen complaints against the police.

34.     On February 28, 2008, the director of the Town's early childhood development center, a Black woman, received a bomb threat in her mailbox at work that read, "Got you Nigger, Boom."  The threat came after several white parents expressed hostility towards the director at a meeting because of the departure of white staff members at the center and more multi-cultural programming at the center.  The police department failed to conduct a proper criminal investigation and identified no official suspects.  The police asked parents with access to the director's mailbox to voluntarily provide their fingerprints at the police station but did not interview them.

35.     In May 2011, Fred Lebow, a white member of the Town's advisory committee, told other town officials that his uncle, Harold Brown, would shoot a female employee of the Town's planning department if he saw her.  Mr. Brown, a white man, is a Brookline resident.  He is a well-known real estate developer and landlord and is known to have a criminal record.  At the time Mr. Lebow made these shooting statements, he was advocating with others on the advisory committee to eliminate the woman's position from the budget.  The woman complained

to the Town's human resources office about the shooting threat after it was relayed to her. Notwithstanding a written town policy requiring the police be contacted in the event of an alleged workplace safety violation, the Town's human resources director, Sandra DeBow, did not contact the police. Ms. DeBow cleared the advisory committee member of wrongdoing after reportedly conducting an investigation. The Chair of the Board of Selectmen, police commissioner Nancy Daly, publicly defended Mr. Lebow, stating that Mr. Lebow's statement was intended as a joke. The woman who reported the matter subsequently resigned from her employment with the Town.

36.     In 2011, Rogelio Rodas, a Hispanic man, reported to the police that his ten-year old son had been struck in the face by a white man while playing outside next to the Lynch Center. Without notice to Mr. Rodas, the police filed an application for a criminal complaint and requested a clerk's hearing at which time the application was denied by the magistrate after a hearing in which no witnesses were called in support of the complaint. Mr. Rodas only learned that the complaint had been dismissed after he inquired about the status of the case with the police prosecutor, Lt. Richard Allen, several months later.

37.     On November 4, 2012, a Black police officer arrested a white man, Joseph McCarthy, for driving under the influence of alcohol after he rear-ended another vehicle. The officer reported that Mr. McCarthy's breath smelled like alcohol and that empty bottles of alcohol were sticking out from under the driver's front seat. A search of the vehicle located 6 empty bottles of Mikes Hard Lemonade and 1 empty bottle of Foster's beer, all still reportedly cold to the touch. The officer reported that Mr. McCarthy was unsteady on his feet and his speech was slow. After Mr. McCarthy was brought to the police station for booking, Sergeant Robert Murphy, a white man and the commanding officer on duty, released him without charges

and arranged for his car to be towed back to the station so he could drive home.  Although Mr. McCarthy did not take or pass a breathalyzer or blood alcohol test, Sergeant Murphy altered the arresting officer's police report to state that Mr. McCarthy was determined not to be under the influence of alcohol.  Although the Black officer reported Sergeant Murphy's misconduct, Sergeant Murphy received only a minor reprimand.

38.     On November 30, 2013, the Massachusetts Commission against Discrimination (MCAD) found probable cause to credit a female employee of the Brookline department of public works' allegations of sexual harassment against her supervisor, Ed Gilbert, a white man. On September 9, 2015, while the matter was pending in the MCAD, Mr. Gilbert reportedly assaulted the woman by deliberately walking into her in the town garage in view of a surveillance camera.  The woman immediately reported the assault to Andrew Pappastergion, the head of the department, and it was reported to the human resources director, Sandra DeBow. Although the workplace safety policy required Ms. DeBow to report the incident to the police, no police investigation was undertaken to determine whether an assault and battery under G.L. c. 265, § 13A or intimidation of a witness pursuant to G.L. c. 268, § 13B had occurred.  Ms. DeBow claimed the video of the incident was not available.  The woman subsequently complained directly to the Brookline police department, but the police did not interview Mr. Gilbert, apply for a criminal complaint, or seek a clerk's hearing to determine whether a criminal charge should issue.

39.     On December 17, 2013, a Black Brookline firefighter with a pending racial discrimination lawsuit against the Town, Gerald Alston, found the word "Leave" written in the dust on the door next to his assigned seat on the firetruck.  After Mr. Alston reported the threatening message, the supervisor on duty ordered the word washed off the truck.  The matter

was reported to the police chief, but the police did not perform an investigation to determine whether a charge of intimidation of a witness was warranted pursuant to G.L. c. 268, § 13B or whether a workplace safety violation had occurred.

40.     On October 15, 2015, Robert Collins, a white off-duty Brookline police officer, reportedly drove his car rapidly at several Hispanic students standing on the street outside of Brookline High School, forcing them to move out of the way to avoid being hit.  The students complained and the Town's human resources department and the police department conducted a joint investigation.  The police department did not investigate whether the off-duty police officer had committed an assault with a dangerous weapon pursuant to G.L. c. 265, § 15A.  The Town's investigation alleged that the white off-duty police officer had not violated any Town policy. The students prepared a detailed rebuttal of the Town's report which was published in the student newspaper, the Sagamore.  The rebuttal was ignored by the Town and the Police Commissioners.

41.     On November 2, 2015, a white male employee of the Town's department of public works, Gary Minukian, threatened to shoot an Hispanic employee of the department.  The police did not arrest Mr. Minukian or apply for a complaint against him pursuant to G.L. c. 275, § 4 for threat to commit a crime.  The police made a statement to the public that the report of a threat had been based on a misunderstanding.

42.     On November 14, 2015, Brookline police officer Duane Danforth shot an unarmed Black man who was running away from seven police officers in Amory Park.  Officer Danforth reported the man was holding what appeared to be a knife "or some other long pointy object" when he took "several strides towards the other officers and [Officer Danforth] and then turned left towards the wooded area of the park."  Officer Danforth reported that he then yelled

"Beanbag" and shot the man "in the midsection on the right side of his body."  Officer Danforth reported that the man "yelled in pain but continued to run."  Officer Danforth reported he yelled "Beanbag" again and shot the man "in the right foot," which caused the man to fall to the ground.  Officer Danforth reported the man stated that he had been holding a stick in his hand and that a 7" stick was found where he fell, but no knife.  Officer Danforth did not report having been in fear for his safety or the safety of other officers before he shot the man.  Officer Danforth reported that the man would be charged with assault with a dangerous weapon pursuant to G.L. c. 265, §15B.  No charge of assault and battery with a dangerous weapon pursuant to G.L. c. 265, §15A was brought against Officer Danforth for shooting the man as he was running away from the police.  The charge against the man was resolved through pretrial probation with no admission of wrongdoing.  The police lacked probable cause to charge the man with a crime.

43.    On December 16, 2015, two Black police officers, Prentice Pilot and Estifanos Zerai-Misgun, attended a meeting of the Town's Diversity, Inclusion, and Community Relations Commission, a Commission appointed by the Police Commissioners.  They reported to the Commission and to Police Commissioner Bernard Greene, the Selectmen's liaison to the Commission, that they had experienced racial harassment, including supervisors in the police department calling them racial slurs.  Mr. Pilot explained that he and Mr. Zerai-Misgun were in danger because they had crossed the "thin blue line."  Mr. Zerai-Misgun stated that his experience with racial profiling within the department had consequences for people of color living and passing through Brookline. Mr. Zerai-Misgun reported that white police officers called him an "FI" (short for "field interrogation") when he wore street clothes to the police station, indicating that they were engaged in racial profiling of Black men.  Officer Pilot and

Zerai-Misgun reported that they had brought their concerns to the police chief in December 2014 and nothing had been done to correct the problem.

44.    Diversity Commissioner Dwaign Tyndal, a Black man, connected the officers' reports with his own experience of racial harassment by the Brookline police.  He reported at the meeting that he had been stopped and questioned by the police on December 24, 2014 in Coolidge Corner without good cause.  He reported that he had subsequently sought out Black men in Brookline and asked them about their experiences in Coolidge Corner with the police. He reported that he spoke to six Black men over the preceding twelve months and that all had reported stories of racial harassment by the Brookline police in Coolidge Corner.  Mr. Tyndal urged immediate action and expressed concern that the police could shoot and kill someone in Brookline.

45.    On January 5, 2016, the Police Commissioners held a public hearing to address the allegations of racial discrimination by the police raised by Officer Pilot and Officer Zerai-Misgun.  The Police Commissioners heard from thirty-three speakers, many of whom talked about specific acts of discriminatory conduct by the Brookline police against Black and Hispanic people.  The speakers included plaintiffs Rogelio Rodas, Juana Baez, and Cruz Sanabria.

46.    At the public hearing, the chairman of the Diversity, Inclusion, and Community Relations Commission, read this statement, which had been unanimously approved by the Commission:

> The Board of Selectmen, as an institution of Town government, has allowed a culture of institutional racism to exist through its past hiring practices. As an example, in the history of the Town's existence there have been [only] two department heads who are people of color. In the past five years the Town has allowed a firefighter who, without dispute, used

the N-word, to be promoted to a supervisory position. And the culture that such actions

foster has led to situations which have brought us here today. The Commission for

Diversity, Inclusion and Community Relations calls upon you, as the elected leaders of

this Town, to exercise your responsibilities and duties, as commissioners of the police

and fire departments, as the elected representatives of this Town, to stamp out this

culture. There must not be a delay. You must act with expedience. There is a history in

this Town of not taking actions on these matters in a timely manner. You must not repeat

this history. This is a matter of extreme urgency, which the Board of Selectmen needs to

address with actions, not words, now

47.    After the meeting, the Police Commissioners took no steps to investigate whether

the police department had engaged in ongoing and systemic criminal violations of the civil rights

of Black and Hispanic people under Massachusetts law (G.L. c. 265, § 37) or applicable federal

law.  On April 14, 2017, Good Friday, the Police Commissioners voted unanimously to terminate

Officer Pilot and Officer Zerai-Misgun.

### *The Board of Selectmen Implicitly Authorize Racially Discriminatory Policing*

48.    The Police Commissioners implicitly authorize racially discriminatory policing

by adopting a "see no evil, hear no evil, find not evil" approach to police misconduct against

Black and Hispanic people.

49.    Upon information and belief, the police department has never sustained a

complaint of misconduct brought by a Black or Hispanic person against a white police officer.

50.    Upon information and belief, the Police Commissioners have never sustained a

complaint of misconduct brought by a Black or Hispanic person against a white police officer.

14

51.     On May 29, 2014, at the request of a committee appointed by the Police Commissioners and chaired by Police Commissioner Nancy Daly, Town Meeting voted to abolish the Town's civil rights commission, which had been provided the authority to:

> Initiate, receive, secure the investigation of and seek the satisfactory adjustment of complaints charging discrimination, or failure to take or delay in taking appropriate action or abuse of authority in connection therewith by any town official or employee which may be brought to the commission's attention.

By moving to abolish the civil rights commission, the Police Commissioners ensured that there would be no independent civilian review of police misconduct.

52.     As of today, the Police Commissioners have not investigated the reason for the stark racial disparities presented in the police department's annual reports or instructed the department to investigate the reason for the disparities.  In 2017, the police department provided a report to the Police Commissioners that specifically highlighted that Black Brookline residents ranged between 2.4% and 3.6% of all arrests by the department over the previous five years, which approximates the percentage of Black residents in Brookline, which is 3%.  The department's report did not explain why the statistic was highlighted given that Black residents of Brookline ranged between 14.8% and 21.9% of all arrests of Brookline residents, a much greater percentage than the population of Black residents in Brookline.

53.     In contravention of the Citizen Complaint procedures, the Police Commissioners decline to hear appeals of complainants against the police, including complaints of racial bias. The Police Commissioners have not held a hearing on any of the complaints brought to their attention at the January 5, 2016 meeting, and the Police Commissioners specifically declined to hear appeals filed by Juana Baez and Cruz Sanabria of the findings made by the police on their complaints.  A report submitted to the Police Commissioners in 2009 determined that the Selectmen had not granted a hearing on a complaint against the police between 1996 and 2007.

In 2009, the procedures were modified to permit an informal hearing at which the Police Commissioners could vote to conduct a disciplinary hearing of an officer. A follow up report submitted to the Police Commissioners in 2014 determined that the Police Commissioners had not voted to conduct a disciplinary hearing on an appeal since the policy was modified in 2009. In 2016, both Juana Baez and Cruz Sanabria placed the Police Commissioners on notice that the police department does not follow the procedural safeguards set by the Citizen Complaint procedures or complete investigations within the allotted time.

### *The Plaintiffs Have Been Harmed by the Town's Custom, Policy, and Practice*

54.     The plaintiffs in this case have each been harmed by the Town's Policy and the Police Commissioners failure to rectify it.

### *Cruz Sanabria*

55.     Beginning in the spring of 2014, Cruz Sanabria's immediate upstairs neighbors, two white women, began harassing him by calling the police for fabricated and trivial reasons. The police did nothing to prevent or deter these repeated and baseless calls.

56.     On March 28, 2014, Mr. Sanabria reported to the police that his neighbor had pushed him and sworn at him. The police documented the assault but did not apply for a criminal complaint against the neighbor for assault.

57.     On August 27, 2014, Mr. Sanabria's neighbor falsely accused him of vandalizing her bicycle. The police documented that no crime had been committed by Mr. Sanabria, but did not apply for a criminal complaint against the neighbor for making a false report of a crime to the police.

58.     On November 17, 2014, the same neighbor falsely accused Mr. Sanabria of closing a door in her face.  The responding police officer, David Hill, interviewed Mr. Sanabria and his two upstairs neighbors.  Officer Hill documented that Mr. Sanabria had closed the door to the basement, which was in a common hallway, in order to get into his own apartment. Officer Hill documented that the neighbor had threatened to call the police on Mr. Sanabria if he removed her bicycle from Mr. Sanabria's property.  Officer Hill documented that although the neighbor claimed to have fallen down the stairs after the door was closed and into a wall, she had no marks on her person or clothing.

59.     Upon information and belief, Officer Hill did not arrest Mr. Sanabria or indicate that he was in trouble in any way because he credited Mr. Sanabria's statement and knew that Mr. Sanabria had not committed a crime.  Officer Hill later described the complaining witness as not being rational.  Later in the evening, Officer Hill called Mr. Sanabria and informed him that the neighbors were out to get him and to be careful.  Officer Hill did not tell Mr. Sanabria he was applying for a criminal complaint against him but did advise him of the procedure for obtaining a restraining order against his neighbors for harassment.

60.     On December 4, 2014, his birthday, Mr. Sanabria received a summons ordering him to appear in Brookline District Court for a show cause hearing on a criminal application by the Brookline police for the felony charge of assault with a dangerous weapon.  The complaint application stated that he had assaulted his neighbor with a door and indicated that he was facing a potential penalty of up to five years in state prison.  The summons caused Mr. Sanabria severe emotional distress.  He was deeply concerned that he might lose his job as a Boston school teacher because of the criminal allegations.  The same month the Mayor of Boston had fired city workers for being arrested for criminal trespass during a Black Lives Matter protest.

61.     On January 23, 2015, after a hearing where he was represented by counsel, the clerk-magistrate denied the application against Mr. Sanabria for lack of probable cause to believe that a crime had been committed.   Photographs of the stairwell were presented that showed the alleged victim could not have fallen down the stairs in the way she described without incurring an injury.

62.     On May 9, 2015, Mr. Sanabria made a citizen's complaint to Police Commissioner Neil Wishinsky, Chair of the Board of Selectmen alleging racial bias in the handling of his case.  The Citizen Complaint procedures require investigations to be completed within 30 days.

63.     On August 27, 2015, three months after filing his complaint, the police department issued an investigatory report denying Mr. Sanabria's complaint.  Contrary to the Citizen Complaint procedures, witnesses did not prepare or sign statements attributed to them in the report.  The report included defamatory statements about Mr. Sanabria's character.  Although the report was required to be held confidentially, a town employee told Mr. Sanabria that defamatory statements about him from the report were circulating in town hall.  Mr. Sanabria provided a detailed response to the report to the Police Commissioners but it was ignored.

64.     On September 24, 2015, Mr. Sanabria appealed to the Police Commissioners pursuant to the Citizen Complaint procedures.   Under the Citizen Complaint procedures, citizen complaint appeals shall be docketed for the Police Commissioners to hear at a Civilian Appeal Hearing within 60 days of the filing of an appeal.

65.     Mr. Sanabria indicated in his appeal that he had evidence that the police had withheld documents relevant to his complaint, namely reports and audiotapes demonstrating that his neighbor had made a false complaint against him in the past.  The Chairman of the Board of

Selectmen, Police Commissioner Neil Wishinsky, referred the matter to the Town Counsel, Joslin Murphy, whose brother-in-law, Myles Murphy, was the keeper of records for the Brookline police.

66.      Although the Police Commissioners are responsible for overseeing the police department, they did not investigate the police for violating G.L. c. 66, § 15, a criminal statute, by withholding relevant records from Mr. Sanabria relating to his citizen complaint.

67.      On April 5, 2016, while Mr. Sanabria's complaint to the Police Commissioners was pending, the Police Commissioners promoted Officer Hill to Sergeant.  In 2010, the police department applied for a criminal complaint against Officer Hill for assault and battery in connection with an off-duty incident in which the alleged victim was hospitalized.  In connection with the underlying incident, Officer Hill wrote a letter to the police apology apologizing for his lack of judgment.  The criminal complaint application was denied by a clerk-magistrate, but it was reported that Officer Hill was required to pay compensation to the alleged victim to settle a federal civil rights lawsuit filed against Officer Hill and other Brookline police officers in the District Court of Massachusetts in Boston.

68.      Under the Citizen Complaint procedures, citizen complaint appeals shall be docketed for the Police Commissioners to hear at a Civilian Appeal Hearing within 60 days of the filing of an appeal.  The Police Commissioners refused to hear Mr. Sanabria's appeal in violation of the Citizen Complaint procedures.

### *Juana Baez*

69.      On August 15, 2015, the Brookline police, including Sergeant Michael Raskin, harassed, intimidated, and falsely charged Juana Baez, a resident of Brookline for seven years, and the mother of three children, two of whom are students in the Brookline public schools, with

disorderly conduct.  Ms. Baez had just returned from the hospital because of complications following a cesarean section.  Ms. Baez was home with her three week old infant son when she discovered that her car was being illegally towed.  The father of her newborn son, Jose Nunez-Guerrero, who is also of Dominican ancestry, parked her car on the side of the driveway in the rear of Ms. Baez's apartment so that he could deliver some groceries for Ms. Baez. The driveway is not marked as a tow zone or a fire lane, and Ms. Baez had obtained a permit to park on public housing property.   A white tow truck driver, Christopher Paulino, immediately hooked up the car, however, as soon as Mr. Nunez-Guerrero went inside with the groceries.

70.     After Mr. Nunez-Guerrero heard the car being place on the lift, he came downstairs and attempted to persuade Mr. Paulino not to tow the car, explaining that he had only been dropping off groceries for his newborn.  Mr. Nunez-Guerrero offered to pay Mr. Paulino the drop fee to release the car, but Mr. Paulino refused, although he later agreed to release the car for a fee of $75 after the police arrived.  Mr. Paulino cursed and yelled profanities loudly when Mr. Nunez-Guerrero attempted to persuade him not to tow the car, creating a disturbance.  Mr. Nunez-Guerrero stepped up into the bed of the tow truck to prevent the driver from leaving with Ms. Baez's only form of transportation.  Ms. Baez came downstairs and attempted to get Mr. Paulino's attention by knocking on the door, while holding her three week infant in her arms.  Mr. Paulino opened and close the door violently, placing her in fear and almost hitting her.  Mr. Nunez-Guerrero called the police on a recorded line and reported that the tow truck driver was towing a lawfully permitted car and trying to start a fight with Ms. Baez.

71.     Approximately five Brookline police officers responded within minutes and immediately behaved aggressively towards Mr. Nunez-Guerrero and Ms. Baez and protectively towards the white tow truck driver.  The police handcuffed Mr. Nunez-Guerrero, and Sergeant

Michael Raskin, the commanding officer on the scene, ordered him not to speak Spanish or else

he would face additional charges. The police yelled at Ms. Baez, falsely accusing her of breaking

the window of the tow truck.  The police demanded that Ms. Baez produce a passport.  When

Ms. Baez indicated that her identification was upstairs in her apartment, the police escorted her

to the apartment and questioned her aggressively about whether her identification was legitimate.

The police refused to hear Ms. Baez and Mr. Nunez-Guerrero's side of the story and accepted

everything the tow truck driver said without investigation or question.  The police checked for

criminal record information about Mr. Nunez-Guerrero and Ms. Baez but not for Mr. Paulino.

The police did not investigate whether Mr. Paulino had illegally towed the vehicle or whether he

had been disorderly.  The police did not apply for a disorderly conduct complaint against Mr.

Paulino. The police allowed Mr. Paulino to charge Ms. Baez a $75 fee to release her car, despite

the fact that the car had a legal permit, was not in a marked fire lane, and the authorized "drop

fee" was only $50.

72.    Mr. Paulino is required to fill out and sign a private tow form at the Brookline

police department every time he tows a car in Brookline and has frequent interactions with the

Brookline police.  For instance, in the first half of August leading up to the incident with Ms.

Baez, the Brookline police department recorded 32 tows by Mr. Paulino.  Mr. Paulino identified

himself only as "Chris" when he called the police dispatch after Mr. Nunez-Guerrero called the

police and the police dispatch did not request further identifying information.  Upon information

and belief, the police knew that Mr. Paulino had a criminal record, including two felony

convictions, knew that Mr. Paulino was overly aggressive in his towing practices including

towing people despite their having lawful permits to park, knew that Mr. Paulino had mental

health and substance abuse problems, and knew that Mr. Paulino held racist views towards

people of color. On the date of the incident, Mr. Paulino posted a photograph of Mr. Nunez-Guerrero standing in the bed of the tow truck and likened him to a "baboon." On the same date, Mr. Paulino posted a photograph of a Confederate flag hanging in his room.

73.    As a result of false, uncorroborated, and uninvestigated claims made by Mr. Paulino, Sergeant Michael Raskin approved criminal complaints against Ms. Baez for disorderly conduct and Mr. Nunez-Torres for disorderly conduct and malicious destruction of property over $250, a felony. An armed and uniformed police officer personally delivered the summons to appear on the charge to Ms. Baez at her apartment approximately two weeks later.

74.    On June 21, 1990, at 12:30 a.m., while off-duty, Michael Raskin, then a patrol officer, reportedly became involved in a traffic dispute with a Black cab driver. The cab driver complained that Officer Raskin had followed him, blocked him in with his car, and said, "You African niggers, you come here to take the jobs from our boys. Why don't you go back to where you came from," and threatened to lynch him with his handcuffs. The internal affairs officer reported that the taxi cab dispatcher reported he overheard Officer Raskin say "Get out of the cab you black son-of-a-bitch." Officer Raskin denied any misconduct and the Police Commissioners dismissed the cab driver's complaint after a hearing.

75.    On January 9, 2015, Leander Smith, a former Brookline police officer, a Black man, wrote to former Chair of the Brookline Board of Selectmen, Deborah Goldberg. Mr. Smith's letter was subsequently forwarded to the Police Commissioners on or before June 10, 2015. Mr. Smith alleged in his letter that he had been terminated from the Brookline police department by the Board of Selectmen in February 2000, despite not doing anything wrong, while white officers who had committed crimes were not. Among other things, Mr. Smith alleged:

> The Brookline Selectmen were aware that Sergeant Michael Raskin had been caught stealing, lying, fixing tickets for his friends, and it's anybody's guess as to how Raskin's cruiser ended up in Jamaica Pond. The Brookline Selectmen kept Officer Raskin on the job in spite of the fact that he certainly did not belong in the BPD. Whenever I criticized Officer Raskin's history of unethical conduct, I was called insubordinate and disrespectful to a superior officer, which was one of the reasons I was terminated.

Upon information and belief, the Police Commissioners did not investigate Mr. Smith's allegations regarding Sergeant Raskin prior to the August 15, 2015 incident involving Ms. Baez and Mr. Paulino.

76.     Although the police report did not identify any police witnesses to the alleged disorderly conduct reported by Mr. Paulino, the Brookline police summonsed Ms. Baez for an arraignment rather than a clerk magistrate's hearing. The police know that a case dismissed at arraignment will remain on and individual's CORI and may prevent them from obtaining employment. The police know that a case dismissed by a clerk-magistrate will not appear on a CORI.

77.     The police also referred Ms. Baez to the department of children and family services. The police do not refer white parents to the department of children and family services in similar circumstances.

78.     Although the police reported that Mr. Paulino alleged that Mr. Nunez-Guerrero had scratched the tow truck with a key, the police did not ask Mr. Nunez-Guerrero any questions about a key or conduct any investigation regarding a key. And no key was found on his person during a routine inventory search at the police station. The application for a complaint stated that the malicious destruction was to a window and did not identify a key as the instrumentality that caused the alleged damage. Sergeant Raskin responded to a request for a date stamp of photographs he allegedly took of the truck by producing a picture of a dry erase board with the date of the incident and Sergeant Raskin's name on it. In response to a defense subpoena, the

23

owner of the tow truck wrote a letter to the Brookline district court indicating that he had not incurred any expenses for any repairs to the truck and had no documents evidencing any damages to the truck.

79.    The police arrested Mr. Nunez-Guerrero and placed him in a police car on the scene while they continued to speak to Ms. Baez and the tow truck driver.  The outside temperature was approximately 85 degrees and the temperature inside the car was at least 15 degrees hotter.  The police did not turn on the air conditioning or open a window until Mr. Nunez-Guerrero rapped on the window to indicate he was suffocating.  The police again left Mr. Nunez-Guerrero in the hot car when they reached the police station.  Had a dog been left in a car in those temperature conditions, the police would have broken the window to provide the dog relief.

80.    The charge against Ms. Baez was dismissed at arraignment, although Ms. Baez had to pay a counsel fee of $150.  Ms. Baez later learned that she did not receive an initial call back for a job as a daycare provider because the dismissed charge appeared on the employer's CORI check of her.   As a result, Ms. Baez was forced to file a motion to have her record sealed which was allowed.

81.    The police referral to the department of children and family services was closed immediately, and the social worker told Ms. Baez that her problem with the Brookline police was the color of her skin.  Without Ms. Baez's permission, the Brookline police later asked the department of children and family services to speak to the social worker about her conversation with Ms. Baez and relate that conversation back to the Brookline police.

82.    The malicious destruction of property charge against Mr. Nunez-Guerrero was dismissed after a hearing by a district court judge on grounds that insufficient evidence had been

submitted to the clerk-magistrate by the Brookline police to support the charge.  Only the

disorderly person charge, which carries a maximum penalty of a $150 fine, remains pending

against Mr. Nunez-Guerrero and has been scheduled for jury trial on May 1, 2017 in Dedham

district court.  Upon information and belief, the Brookline police department has urged the

Norfolk County District Attorney's office to pursue the case because of Ms. Baez's complaint

against the police department.  In an internal report about the incident, the Brookline police

stated that disorderly person charges are typically dismissed by the Norfolk County District

Attorney's office if it is a first offense.  Mr. Nunez-Guerrero has no prior offenses for disorderly

person or any other charge.

83.    Ms. Baez suffered severe emotional distress as a result of her treatment by the

police.  She is now afraid to have any interactions with the police.

84.    After receiving the summons, Ms. Baez went to the Brookline police department

to file a complaint about the way she and Mr. Nunez-Guerrero had been treated by the police.

Ms. Baez was told that the person in charge of taking complaints was unavailable and given the

person's number.  Ms. Baez called the number but nobody answered.  Ms. Baez was afraid to

leave her personal information in a voicemail and did not pursue her complaint further for

several months.  On December 3, 2015, Ms. Baez filed a detailed complaint in writing to the

Selectmen about the police misconduct.  Although Ms. Baez expressly stated that she only

wanted to be contacted through specified representatives, the Town ignored her request and

contacted her directly.  By ignoring Ms. Baez's express wishes to be contacted through her

representatives, the Town violated the provision of the Citizen Complaint procedures which

expressly permits complainants to be represented by counsel or other representatives during the

complaint process.

85.     On January 5, 2016, Ms. Baez spoke about her mistreatment by the Brookline police at a public hearing held by the Police Commissioners regarding complaints of racism against the Brookline police department.

86.     On January 20, 2016, the Brookline police requested that Ms. Baez agree to disclose all of her "public, private, or confidential records" to the police and to sign a document releasing any person or agency who provided information about Ms. Baez from "any and all liability."  Ms. Baez did not sign the release.

87.     On May 23, 2016, five months after her complaint, the Brookline police issued an investigatory report denying Ms. Baez's complaint.  The Citizen Complaint procedures require investigations to be completed within 30 days.  Contrary to the Citizen Complaint procedures, witnesses did not prepare or sign statements attributed to them in the report.  Ms. Baez provided a detailed response to the investigatory report to the Police Commissioners but it was ignored.

88.     On June 14, 2016, Ms. Baez appealed to the Board of Selectmen. Under the Citizen Complaint procedures, citizen complaint appeals shall be docketed for the Police Commissioners to hear at a Civilian Appeal Hearing within 60 days of the filing of an appeal. The Board of Selectmen refused hear Ms. Baez's appeal in violation of the Citizen Complaint procedures.

### *Rogelio Rodas*

89.     On October 9, 2015, Rogelio Rodas was returning to his home at 22 High Street in Brookline when he encountered a utility crew performing work by the entrance to the parking lot, which was blocked by orange construction cones.  Mr. Rodas was traveling with a neighbor and his 12 years old son, a student in the Brookline public schools.   A uniformed Brookline police officer, Jeffrey Hutnick, was working a paid detail at the site, and Mr. Rodas asked him

how he could get into the parking lot.  Officer Hutnick responded rudely, refusing to move the

cones, and telling Mr. Rodas that he should drive over the cones if could not fit between them.

Mr. Rodas drove into the parking lot over one of the cones and parked the car.  Mr. Rodas then

picked up the fallen cone, put it to one side on the sidewalk so that other residents could enter the

parking lot, and returned to his car.   Officer Hutnick was upset that Mr. Rodas moved the cone.

He ran after Mr. Rodas, grabbed him by the shoulder, and pushed him back to the entrance of the

parking lot.  Mr. Rodas' son started to cry out of fear for his father's life.  Officer Hutnick

screamed at Mr. Rodas to "pick up the fucking cone."  Officer Hutnick said that he could arrest

Mr. Rodas for destroying property.  He told Mr. Rodas that he would "shove the cone up [his]

ass."

90.    Mr. Rodas complained at the Brookline police department about Officer

Hutnick's behavior, and Sergeant Tom Ferris arranged a meeting.  Mr. Rodas wanted Mr.

Hutnick to apologize to his son.  Mr. Rodas met with Sergeant Ferris and Officer Hutnick, but

Officer Hutnick immediately accused Mr. Rodas of behaving rudely towards him during the

October 9 incident and Mr. Rodas ended the meeting.

91.    The area of the 22 High Street parking lot where Mr. Hutnick assaulted Mr. Rodas

is under video surveillance, but the police did not share the video with Mr. Rodas when he raised

the issue in an interview with the police.

92.    On May 18, 2016, seven months after Mr. Rodas made his complaint, Lieutenant

Paul Campbell completed an investigatory report regarding Mr. Rodas' complaint.  The Citizen

Complaint procedures require investigations to be completed within 30 days.  The report found

no violation by Officer Hutnick, but nonetheless recommended that he receive counseling.  Lt.

Campbell concluded that had Officer Hutnick assisted Mr. Rodas in entering the parking lot, the

incident likely would have been avoided.   Contrary to the Citizen Complaint procedures,

witnesses did not prepare or sign statements attributed to them in the report.

93.    A video of the incident demonstrates that Officer Hutnick ran at Mr. Rodas and

pushed him once.  Although parts Officer Hutnick's interactions with Mr. Rodas are out of the

frame, Lieutenant Campbell's investigation confirmed through a second police officer that

Officer Hutnick grabbed Mr. Rodas after he ran up to him.

94.    Mr. Rodas did not appeal the finding to the Police Commissioners because he

believed it would be futile and he had already filed a civil rights action in this court.

### *Demetrius Oviedo*

95.    On November 8, 2015, the Brookline police falsely arrested Mr. Oviedo for

disorderly conduct, resisting arrest, and assault and battery on a police officer.  Mr. Oviedo, his

brother, and a friend were returning from a bar in Brighton, walking down Commonwealth

Avenue towards Mr. Oviedo's home on Egmont Street in Brookline, when a Brookline police

officer, Sgt. Matthew McDonnell, confronted them and asked them to produce identification.

Mr. Oviedo asked why the officer needed their identification and why they were being stopped.

Sgt. McDonnell ignored these questions and called for back-up.  Several police cars soon arrived

on the scene.  Mr. Oviedo continued to ask why they were being stopped.  Mr. Oviedo's brother

became upset and the police started to arrest him.  Mr. Oviedo took a step forward to see what

was happening with his brother and the police immediately took him to the ground, handcuffed

him, and arrested him.  The police claimed the reason for the stop was that Mr. Oviedo's friend

had urinated in public, but the police did not arrest the friend.  The police had no basis to arrest

Mr. Oviedo for disorderly conduct, resisting arrest, or assault and battery on a police officer.

96.     At the police station, Mr. Oviedo posted bail and was released from the holding

cell.  Mr. Oviedo asked the police why he needed to be fingerprinted.  The woman conducting

the fingerprinting told him to shut up and not ask questions.  She arranged for him to be placed

back into his cell, where he had to wait several more hours before being released.

97.     The chief of police sent a message to Mr. Oviedo that his case could be dismissed

if he wrote a letter of apology to the arresting police officers.  Mr. Oviedo refused to write a

letter of apology and his case was dismissed upon payment of $600 in costs.  Mr. Oviedo was

informed that one police officer claimed to have injured their knee during the arrest and another

officer was seeking restitution for damage to an expensive pair of glasses.

98.     On another occasion, Mr. Oviedo was getting out of a car when Sergeant Michael

Raskin pulled up to him quickly in a marked police car, alleging that he "fit the description" of a

robbery suspect.  Sergeant Raskin claimed that Mr. Oviedo was the same height and was wearing

the same clothing as the suspect.  Sergeant Raskin backed off when he realized that Mr. Oviedo

was in the company of an off-duty Brookline police officer.  The claim that a Black or Hispanic

person "fits the description" of a criminal suspect is often used to harass Black and Hispanic

people in Brookline.

99.     Mr. Oviedo did not complain to Town officials about how he was treated by the

police because he believed it would be futile.

100.    On December 7, 2016, the Town of Brookline informed Mr. Oviedo that it was

bypassing him for a position as a firefighter on the Brookline fire department because of the

dismissed charges against him.  The Town of Brookline was required to inform Mr. Oviedo of

the reasons for the bypass because Mr. Oviedo scored higher on the civil service exam than the applicant the Town of Brookline hired for the position. Civil Service appointments and bypasses are made by the appointing authority, which for the Brookline fire department is the Board of Selectmen.

### *Class Allegations*

101.    As a direct result of the Policy, hundreds of Black and Hispanic individuals have been targeted for unwarranted criminal charges, criminal investigations, and threats of criminal charges because of their race. The members of the class are so numerous as to render joinder impracticable. Joinder is also impracticable because many members of the class either do not have the ability to obtain counsel to seek redress in court for the harms caused by dismissed and threatened criminal charges or do not bring individual claims for fear of retaliation and reprisal by the Town of Brookline. There is no avenue for the protection of the class members' constitutional rights other than a class action.

102.    The existence and operation of the Town's unconstitutional policy poses a question of law and fact common to the class. The common questions include whether the Defendants have encouraged, sanctioned and failed to rectify the Policy and whether the Policy caused harm to the class members and provided unjustified benefits to white people.

103.    The claims of the named Plaintiffs are typical, and the named Plaintiffs will fairly and adequately represent and protect the interests of the class. The Plaintiffs represent a cross-section of the people who have been harmed by the Town's unconstitutional policy.

104.    The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## COUNT I

105.    Plaintiffs repeat and incorporates the above allegations.

106.    The Town of Brookline violated the Fourteenth Amendment guarantee of equal protection and freedom from racial discrimination by targeting Black and Hispanic people for unwarranted criminal charges, criminal investigations, and threats of criminal charges while failing to investigate and enforce the criminal law equally against white people.

107.    The Town of Brookline violated the First Amendment right to freedom of speech and to petition the government for redress of grievances by deterring Black and Hispanic people from making complaints against the Brookline police.

108.    The Town of Brookline's unconstitutional policy, practice, and custom caused Plaintiffs to suffer damages compensable pursuant to 42 U.S.C. § 1981, § 1983, and § 1985.

109.    The Town of Brookline's unconstitutional policy, practice, and custom violates the rights of the Plaintiffs and all Black and Hispanic people who live in and pass through the Town of Brookline.

110.    The Town of Brookline's policy, practice, and custom has caused the Plaintiffs damages.

## COUNT II

111.    Plaintiffs repeat and incorporate the above allegations.

112.    The Police Commissioners have encouraged, sanctioned, and failed to rectify a policy of targeting Black and Hispanic people for unwarranted criminal charges and threats of criminal charges while failing to investigate and enforce the criminal law equally against white people.

113.    The Police Commissioners failure to adequately and properly monitor, discipline, and supervise the Brookline police department and its officers violated the Plaintiffs' right to equal protection under the Fourteenth Amendment of the United States Constitution.

114.    The Police Commissioners violated the Plaintiffs' right to freedom of speech and to petition the government for redress of grievances under the First Amendment of the United States Constitution by deterring Black and Hispanic people from making complaints against the Brookline police.

115.    The Police Commissioners' acts and omissions violate the rights of the Plaintiffs and all Black and Hispanic people who live in and pass through the Town of Brookline.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request judgment against Defendants as follows:

A.    Declare that the Defendants violated the First and Fourteenth Amendments to the United States Constitution;

B.    Enter Judgment for the Plaintiffs and against the Defendants on all Counts;

C.    Enjoin the Town of Brookline from enforcing its unconstitutional policy and assign an independent third-party to supervise the police department;

D.    Award damages sufficient to compensate Plaintiffs, in an amount to be proven at trial;

E.    Certify the class harmed by the policy pursuant to Fed. R. Civ. P. 23, certify Plaintiffs as representative of the class, and designate Plaintiffs' counsel as counsel for the class;

F.    Establish a reparations fund for persons harmed by the Town's policy;

G.    Award costs and attorney's fees pursuant to 42 U.S.C. § 1988;

H.      Award such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

JUANA BAEZ, CRUZ SANABRIA,
ROGELIO RODAS, and DEMETRIUS
OVIEDO

By their attorney,

_____/s Brooks A. Ames_____
Brooks A. Ames (BBO #641192)
BROOKLINE JUSTICE LEAGUE, INC.
1309 Beacon Street, 3rd Floor
Brookline, MA 02446
brooks@brooklinejustice.org
(617) 763-5526

Dated:  April 19, 2017