0001
```
1                                      VOLUME 1
                                       PAGES: 1-148
2                                      EXHIBITS: 1
3
               UNITED STATES DISTRICT COURT
4          FOR THE DISTRICT OF MASSACHUSETTS
                   No. 1:17-cv-10661-GAO
5
      ****************************************
6      JUANA BAEZ, Individually and on behalf of
       all others similarly situated, et al.
7
            Plaintiffs,
8
       vs
9
       TOWN OF BROOKLINE, MASSACHUSETTS BROOKLINE
10     POLICE COMMISSIONERS, et al.
11         Defendants.
       **********************************
12
13     (Full caption on next page)
14
15
16
            VIDEOCONFERENCE DEPOSITION OF ISA EBOWE
17                 Friday, April 17, 2020
                   9:57 a.m. - 1:20 p.m.
18
19
20
21
22
            Shannon M. Crowley, RPR, CSR
23     EPPLEY COURT REPORTING, A LEXITAS COMPANY
            508.478.9795    508.478.0595 (Fax)
24          www.eppleycourtreporting.com
```
0002
```
1          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
2
                               No. 1:17-cv-10661-GAO
3
      ***********************************
4      JUANA BAEZ, Individually and on behalf of
       all others similarly situated,
5      JOSE ALBERTO NUNEZ-GUERRERO, Individually and
       on behalf of all others similarly situated,
6      CRUZ SANABRIA, Individually and on behalf of
       all others similarly situated,
7      ROGELIO RODAS, Individually and on behalf of
       all others similarly situated,
8      DEMETRIUS OVIEDO, Individually and on behalf of
       all others similarly situated,
```

```
            Plaintiffs,
10
    vs
11
    TOWN OF BROOKLINE, MASSACHUSETTS BROOKLINE
12  POLICE COMMISSIONERS, NEIL WISHINSKY, In his
    Individual and Official Capacities,
13  NANCY DALY, In her Individual and Official
    Capacities,
14  BEN FRANCO, In his Individual and Official
    Capacities,
15  NANCY HELLER, In her Individual and Official
    Capacities,
16  BERNARD GREENE, In his Individual and Official
    Capacities,
17
            Defendants.
18  **********************************
19
20
21
22
23
24
0003
 1                A P P E A R A N C E S
 2
 3  (Counsel, witness, and court reporter appeared
    remotely)
 4
 5  Representing the Plaintiff:
 6          BROOKLINE JUSTICE LEAGUE
            1309 Beacon Street, Suite 3
 7          Boston, Massachusetts 02446-5252
            BY:  BROOKS AMES, ESQ.
 8          617.763.5526
            brooksames1@gmail.com
 9
10   Representing the Defendant:
11          LOUISON, COSTELLO, CONDON & PFAFF, LLP
            101 Summer Street
12          Boston, Massachusetts 02110
            BY:  JOSEPH PADOLSKY, ESQ.
13          617.439.0305
            jpadolsky@lccplaw.com
14   and
            TOWN OF BROOKLINE
15          333 Washington Street
            Brookline, Massachusetts 02445
16          BY:  MICHAEL DOWNEY, Esq.
            617.730.2190
17          Mdowney@brooklinema.gov
18
19
20
21
```

```
23
24
0004
 1                     I N D E X
 2
    WITNESS                                    PAGE
 3
 4  ISA EBOWE
 5
 6  Examination by Mr. Ames                      6
 7  Examination by Mr. Padolsky                 87
 8
 9                   E X H I B T S
10
    NO.        DESCRIPTION                     PAGE
11
12  1      Printout from Google Maps           136
13
14
15   *Exhibit Electronically attached to the
16   transcript.*
17
18
19
20
21
22
23
24
0005
 1  ------------------------------------------------
 2              P R O C E E D I N G S
 3                   9:57 a.m.
 4  ------------------------------------------------
 5
 6
 7
 8              THE COURT REPORTER:  The attorneys
 9  participating in this deposition acknowledge
10  and stipulate that I will be administering the
11  oath and reporting this deposition remotely.
12              Do you agree?
13              MR. PADOLSKY:  Yes.
14              MR. AMES:  Yes.
15              MR. DOWNEY:  Yes.
16
17
18
19              ISA EBOWE, having first been
20  satisfactorily identified and duly sworn by the
21  Notary Public, was examined and testified as
22  follows:
23
24
0006
 1  EXAMINATION BY MR. AMES:
```

 3          A.    Yes.  Good morning.
 4               MR. AMES:  Before I get started,
 5     Joe, can we agree to the same stipulations as
 6     in the Franco deposition?
 7               MR. PADOLSKY:  Yes.  Why don't you
 8     state them for the record just because it has
 9     been a little while.
10               MR. AMES:  Sure.  No objections,
11     except as to form.  Motions to strike will be
12     reserved until the time of trial.
13               The deponent will have an
14     opportunity to read the deposition and prepare
15     an errata, if there are errata - if there are
16     mistakes that he identifies in the deposition
17     transcript.
18               We would waive the requirement -
19     any requirements of notarization.  Typically
20     it's 30 days to read and sign.
21               But if Mr. Ebowe requires more
22     time, we would extend that time.  And just
23     because Mr. Ebowe is not represented by counsel
24     in this deposition, I'll just explain that an
0007
 1     errata is basically a sheet of paper that you
 2     can fill out if you find that the stenographer
 3     may have misinterpreted something you said or,
 4     you know, confused a yes for a no or gotten a
 5     word wrong.  That's your opportunity.
 6               So that's just part of the process.
 7     Do you understand?
 8               THE WITNESS:  Yes.
 9     BY MR. AMES:
10          Q.    So I typically give a few ground
11     rules at a deposition.  And I think they're
12     particularly important since we're all in
13     different locations.
14               The most important one is please
15     allow me to finish my question before you begin
16     answering, okay.  Yes?
17          A.    Yes.
18          Q.    And also, and this can be awkward,
19     but also in an ordinary conversation you would
20     often respond by nodding or shaking your head
21     or just saying uh-huh.
22               In a deposition, in order for us to
23     get a clean record, for the stenographer to get
24     a clean record, you have to respond verbally
0008
 1     with a yes or a no or whatever the answer may
 2     be.  Do you understand?
 3          A.    Yes.
 4          Q.    And if in the course of the
 5     deposition you don't understand a question I
 6     ask, please, please let me know, and I will try
 7     to frame it or rephrase it in a way that you
 8     can understand, okay?

```
10        Q.    All right.  What is your full name?
11        A.    So my first name is Isa.  My last
12   name is pronounced Ebowe, so we have to correct
13   that.
14        Q.    And how - thank you.  How do you
15   spell your last name?
16        A.    It is E-B-O-W-E.
17        Q.    Pronounced Ebowe?
18        A.    Like you would pronounce ebony.
19        Q.    Ebowe?
20        A.    It's like ebony.  If you were to
21   pronounce it in the English way, it would be
22   E-B-O-N-Y is how you pronounce it.
23        Q.    Thank you.  And how old are you,
24   Mr. Ebowe?
0009
1         A.    Ebowe.
2         Q.    Ebowe.
3         A.    Like Ebony and Ivory.
4         Q.    Thank you.  How old are you,
5    Mr. Ebowe?
6         A.    So I'll be 51 this year.
7         Q.    You are 51 or you will be 51?
8         A.    I was born in '68.  No.  I'm sorry.
9    52.
10        Q.    What month in '68?
11        A.    May.
12        Q.    And where were you born, Mr. Ebowe?
13        A.    I was originally born in Benin.
14        Q.    Benin?
15        A.    B-E-N-I-N.
16        Q.    How long have you lived in the United
17   States?
18        A.    I would put it at, I would say, about
19   27 years, approximately.
20        Q.    How old were you when you came to the
21   United States?
22        A.    I came here when I was - precisely
23   when I was 23.
24        Q.    23?
0010
1         A.    Yes.
2         Q.    Are you a United States citizen?
3         A.    Yes.
4         Q.    When did you become a citizen?
5         A.    I became a U.S. citizen in 2003.
6         Q.    What is your educational background?
7         A.    My educational background is I went
8    to the University of Massachusetts.  My
9    background is in business management, but my
10   concentration is information systems.
11        Q.    And when did you graduate?
12        A.    I graduated that same year, 2003.
13        Q.    What have you done for work since
14   2003?
15        A.    I've always worked in the field of
```

17    developmental disability, but I also run a
18    nonprofit which is called Generis International
19    where we work with children that were orphaned
20    due to crisis.
21        Q.    Can you spell that, Generis?
22        A.    Yes.  G-E-N-E-R-I-S.
23        Q.    How long have you been running that
24    nonprofit?
0011
1         A.    Since 2008.
2         Q.    And do you have a family?
3         A.    Yes, I do.
4         Q.    Who's in your family?
5         A.    I have a wife and a son.  My wife's
6     name is Jacqueline, and my son's name is
7     Dustin.
8         Q.    How old is your son?
9         A.    My son is 16.
10        Q.    16?
11        A.    Correct.
12        Q.    I'm sorry.
13        A.    16.
14        Q.    I have a 16-year-old daughter.
15        A.    Okay.
16        Q.    Not always easy.
17        A.    Yes.  I know.
18        Q.    I'm going to ask you about July 7,
19    2016.  Does that day stand out to you?
20        A.    Yes.
21        Q.    Can you tell me how you were employed
22    on July 7, 2016?
23        A.    On July 7, 2016, I was working for
24    Jewish Family and Children Services.
0012
1         Q.    And what is Jewish Family and
2     Children Services?
3         A.    Jewish Family and Children Services
4     is a charity organization that works really
5     with different charities, but the department I
6     worked at we were working with people with
7     developmental disabilities.
8         Q.    And what were you doing on July 7th,
9     2016?
10        A.    On that day I took my client shopping
11    at Walgreens in Brookline.
12        Q.    And when you say "client," what does
13    that mean?
14        A.    These are individuals with
15    developmental disability that were directly
16    under my care.  And I assisted them with, you
17    know, shopping, doctor's appointments, getting
18    them services they need.
19              I also assisted them with, you know,
20    administering medications, you know, banking,
21    and their basic needs here.
22        Q.    And what was the purpose of taking

24          A.     That was - we went there so that he
0013
 1      could shop for the week.
 2          Q.     Which Walgreens did you go to?
 3          A.     It was in Brookline.  I really don't
 4      have the name of the street right now.  I can
 5      reference if I have to, but I don't --
 6          Q.     That's okay.  And how did you go to
 7      Walgreens?
 8          A.     We drove.
 9          Q.     In whose car?
10          A.     My car.
11          Q.     What kind of car were you driving?
12          A.     At that time I was driving a Nissan
13      LEAF.
14          Q.     Do you recall around what time you
15      went to Walgreens?
16          A.     It would have been about - it would
17      have been 3:30, something like that.
18          Q.     In the afternoon?
19          A.     In the afternoon, yeah.
20          Q.     Was it light out?
21          A.     It was light out, yes.
22          Q.     What happened when you got to
23      Walgreens?
24          A.     Usually when I drove my client, I
0014
 1      give him an hour to shop.  And within that
 2      hour, if I have work to do, I just focus on the
 3      work.
 4                 Sometimes when I have free time, I
 5      will take a walk.  So when I dropped him off, I
 6      did - I went through the same routine.  I
 7      completed my work in the car, and then took a
 8      walk in the neighborhood.
 9          Q.     When you say you completed your work
10      in the car, what does that mean?
11          A.     That would be if I have some
12      paperwork to complete related to my work.  So
13      what I do is I just get that for the week, and
14      then if I have some free time I get all that
15      work done before I get back to the office.
16          Q.     And had you done this before?
17          A.     Oh, yes.  This was a routine work for
18      me.
19          Q.     You had been to this Walgreens
20      before?
21          A.     Yes.
22          Q.     And had you taken a walk while your
23      client was shopping before?
24          A.     Yes.
0015
 1          Q.     Was there anything different about
 2      your walk on this occasion than ordinary?
 3          A.     No.
 4          Q.     And tell me what your walk consisted

```
  6        A.    What I did, I walked - I just walked
  7   around the neighborhood.  I begin - I would
  8   have to look at the street.
  9             I would give myself about, you know,
 10   a good 25 to 30 minutes' walk when I can.
 11   Again, that depends on how free I am at that
 12   time.  So I walked around the neighborhood, you
 13   know, and came back to the parking lot.
 14        Q.    And what happened when you came back
 15   to the parking lot?
 16        A.    When I came back to the parking lot,
 17   I noticed my client was not out of Walgreens,
 18   so which indicated he was still shopping.
 19             So I decide to stand - to wait for
 20   him beneath a tree that was in the parking lot.
 21   Then I had my phone with me, and I was reading
 22   the news on my phone.
 23        Q.    And what happened next?
 24        A.    Yes.  So then I noticed - I realized
0016
  1   I had the precision screwdrivers I bought a day
  2   before, and it was in my trunk.
  3             I thought I should put it in front of
  4   my car that way I would remember to bring in -
  5   bring the screwdriver with me to the house when
  6   I returned back home.
  7             So what I did, I went into my trunk.
  8   I clicked the - I opened the trunk with my
  9   key - my fob key and took out the screwdriver.
 10             And I went around my car towards the
 11   driver's side, opened the front door, and threw
 12   it - and tossed the screwdriver into my front
 13   seat.
 14        Q.    Did you say "fob key"?
 15        A.    Yes.  The fobs, yes.  That is
 16   correct.
 17        Q.    Does it make a noise?
 18        A.    It does.
 19        Q.    Did it make a noise when you opened
 20   the trunk?
 21        A.    Yes.  It makes noise and the light
 22   also kind of shows up.
 23        Q.    What is the noise that it makes?
 24        A.    It's going to go click.  It's a
0017
  1   typical click noise, you know, when you open
  2   your car.  It's automatic door, so it make that
  3   click noise and then flashes.
  4        Q.    What happened after you put the
  5   screwdrivers in the car?
  6        A.    So when I put the screwdrivers in the
  7   car, and then I closed my door.  And when I
  8   turn around to leave, there was a police
  9   officer standing right behind me.
 10        Q.    How close was he?
 11        A.    I would put him, I would say, an
```

```
13        Q.    And how was he dressed?
14        A.    He was dressed in the police uniform.
15        Q.    Was that the first time you had
16   noticed that there was a police officer in your
17   vicinity?
18        A.    Yes.  Practically, yes.
19        Q.    And what happened after you noticed
20   the police officer?
21        A.    So what happened when I noted - it
22   wasn't surprising to me that, you know, there
23   is an officer in the vicinity.  Just he looked
24   so serious and had his hand on his gun.
0018
1              That was what got my attention when I
2    found there was a police officer close to my
3    car.
4         Q.    And what happened next?
5         A.    So he confronted me and asked me to
6    put up my hands, and I did immediately.  So I
7    asked him what was going on, and I said, You
8    got the wrong guy.  And he commanded me not to
9    say anything.  Said, Be quiet.
10        Q.    After he asked you to put your hands
11   up and you complied and he asked you to be
12   quiet, what happened next?
13        A.    So I knew I had to - again, this guy
14   looks very different.  He was just too serious,
15   and I was afraid he was going to shoot me if I
16   made any mistake.
17        Q.    At that point had he told you why he
18   was stopping you?
19        A.    No, he did not.
20        Q.    What happened next?
21        A.    So he asked me to move and moved me
22   towards the tree.  To the right side of the
23   parking lot there were trees, and so he
24   followed me behind.
0019
1              When we got there, he asked me to lie
2    down on the floor, spread eagle, face down.
3         Q.    Were you still - where he asked you
4    to lie down, was that on the pavement?
5         A.    Yes.  It was on the pavement, yeah.
6    Now, one additional information.  I still had
7    my cell phone in my right hand, you know, the
8    one I was using earlier to read the news.  So I
9    laid down, spread eagle, with my cell phone
10   facing down.
11        Q.    Did he tell you why he was asking you
12   to move from where he confronted you?
13        A.    No.  There was no information of what
14   was going - what was going on as far as the
15   activities here.
16        Q.    What happened after you got down on
17   the pavement spread eagle?
18        A.    So the next thing I noticed the
```

20    so that really freaked me out.
21         Q.     And where on your back was his boot?
22         A.     Between my neck and my lower - upper
23    back, right on my spine right there.
24         Q.     What happened next?
0020
1          A.     So then - so now this time I was
2     very, very - because I didn't know what was
3     going on.  And he went - you know, took the
4     phone from my hand, and threw it to the side.
5          Q.     What did he do after - what happened
6     after he threw your phone?
7          A.     So then I noticed other police
8     officers in the parking lot.  I could see them
9     from - he is speaking towards my right-hand
10    side, you know, from his boot looking at the
11    car.  And I yelled out, I said, You got the
12    wrong guy.
13         Q.     Were the other police officers in
14    uniform?
15         A.     Yes.  Everyone was in uniform.  At
16    least the ones I saw were in uniform.
17         Q.     Were they in their police cars?
18         A.     I couldn't see the police car at that
19    time, because I was laying down.  So I could
20    just see other police officer, because I knew
21    it was more than one police officer because I
22    could see them at that time.
23         Q.     And when you said, You got the wrong
24    guy, did anybody respond to you?
0021
1          A.     I was talking to the officer that had
2     his boot on my back.  I said, You got the wrong
3     guy.  So he pressed - he pushed more pressure
4     on my back.  That was what I noticed, so.
5          Q.     Was it painful?
6          A.     Of course, yes.  Yes, it was painful.
7          Q.     Did the other officers other than the
8     officer who was putting his boot on your back,
9     did they say anything in that moment?
10         A.     Yes.  I could see one of the officers
11    by my car, and they said, you know, Who is the
12    owner of this car?  So I said, That is my car.
13                You know, and the officer asked me
14    what my name was.  No, sorry.  Said, Who is
15    Isa, or something to that extent.
16                And I said, It's me.  That is my car.
17    That was my answer.  You know, it was all very
18    confusing at that time.
19         Q.     How far away was your car?
20         A.     I would say we would have walked
21    across the - I'm not very good with distance,
22    but it would have been - you know, I would put
23    it kind of it would be two cars away, if there
24    were cars parking, something to that nature.
0022

2    away?
3        A.    Yeah, yeah, so we went across the
4    road to where that happened.
5        Q.    What happened next?
6        A.    Now, when I established it was my
7    car, and I think the officer was - said, you
8    know, to the effect that, You're from Kingston?
9    I said, Yes.  What are you doing here?
10          I did say I drove my - I work in this
11   area, and I drove my client to the store.  So
12   we had the communication to that effect with
13   the officer that was standing by my car.
14       Q.    And that's not the officer who had
15   his boot on your neck?
16       A.    No.  The one that had his boot on my
17   back was determined to - he still had his boot
18   on my back.  He still had his hand to his gun.
19          So when I said to the effect - again,
20   I said, You got the wrong guy.  I was thinking
21   they were after somebody that looks like me.
22          Then he ease his boot off my back and
23   asked to the effect, Do you have some ID on
24   you?
0023
1        Q.    So the person who asked you if you
2    had some ID on you was the officer who had
3    initially confronted you?
4        A.    Yes, yes.
5        Q.    And the officer who asked you, Who is
6    Isa, and you told him that it was your car,
7    that was a separate officer?
8        A.    That was a separate officer, correct,
9    yes.
10       Q.    And what happened after you were
11   asked if you had some ID on you?
12       A.    So he took his boot off my back and
13   asked me to sit up.  He still had his hand on
14   his gun.
15          So I sat up sitting down on the
16   floor.  I told him I'm going to reach into my
17   pocket and bring out my wallet.
18          And he asked me to go ahead.  So I
19   put my hand in my pocket.  I pulled the wallet
20   out slowly.
21          I showed him every step of the way
22   and say, It's a wallet, see.  It's a black
23   wallet, and I'm going to bring it out.
24          So when I pull it out, I showed him
0024
1    again it is just a wallet.  Look at it, it's my
2    wallet.
3          I did that three times.  Then at that
4    time my wallet was out of my pocket.
5        Q.    And what happened then with your
6    wallet?
7        A.    So I said, I'm going to open my

```
 9      wallet, and I brought out my driver's licence.
10           Q.    Is that the same license you showed
11      the court reporter earlier?
12           A.    Yes.
13           Q.    And what happened after you brought
14      out your driver's license?
15           A.    I handed it to the police officer.
16           Q.    The officer who confronted you
17      originally?
18           A.    Yeah.
19           Q.    What happened next?
20           A.    So he looked at it.  And, you know,
21      it had been established it was me.  So he
22      helped me up off the floor.
23           Q.    He helped you off the floor?
24           A.    The detective grabbed onto my hand
0025
 1      and then I got up off the floor.
 2           Q.    And then what happened?
 3           A.    Then he said, I hope you understand.
 4           Q.    And did you respond?
 5           A.    Yes.  I said, I don't understand.
 6      I've never been roughed up by a police officer
 7      before.  I do not understand.
 8           Q.    And was there - did he say anything
 9      more or did anybody say anything more?
10           A.    No.  Nobody said anything.  Just he
11      said it again, I hope you understand.  I said,
12      No, sir, I do not understand.
13                 So then he spoke on his phone that he
14      had on his shoulder, his mic thing there, to
15      the effect that he needed to put in a report,
16      and he gave me his card if I have any
17      questions, and he left.
18           Q.    How did you feel at that point?
19           A.    I was scared and humiliated at the
20      same time.
21           Q.    What was your physical condition?
22           A.    I just - my back was hurting.  And I
23      have to call work immediately to let them know
24      what happened.  And I also called my wife to
0026
 1      tell her what was going on.
 2           Q.    Who did you speak to at your work?
 3           A.    I think I spoke to my immediate
 4      supervisor.  Her name was Terry.  I forget her
 5      last name, but I can look that up.
 6           Q.    A man or a woman?
 7           A.    It was a lady.
 8           Q.    Named Terry?
 9           A.    Yes.
10           Q.    And she was your supervisor?
11           A.    Was my supervisor at the time,
12      correct.
13           Q.    And did you give her an account of
14      what had happened to you?
```

16      Q.    And did she say anything other than
17  to take your report?
18      A.    Yes.  She asked me some questions
19  about, you know, my client.  I told her the
20  client was still in the store, and he did not
21  witness any of the interaction with the police.
22      Q.    And how did that conversation
23  conclude?
24      A.    I just said if I - I concluded that I
0027
1   - if I needed to go home, whatever I need to
2   help myself, I should do it.  She also offered
3   to come in and pick up the client if I wanted
4   to.
5       Q.    Did you have any discussion with her
6   or did she mention filing a complaint against
7   the police?
8       A.    No.  She didn't mention about
9   complaint.  I think we have a company policy
10  that she - again, I don't want to speak for
11  her - you know, if we have workplace injuries,
12  I think that was what she was going by.
13      Q.    And you also - what happened after
14  you spoke to Terry?
15      A.    So now everyone is gone.  The police
16  have left.  I have noticed that there was more
17  than one police officer in parking lot at that
18  time.  So the cruiser, they've all driven off
19  and everyone is gone.
20            So my client came out of the store.
21  My client lived very close to - he lives on
22  Beacon Street, so was very close to where we
23  went.
24            So I figured I could still drive him
0028
1   home.  So I told him what happened.  You know,
2   he said he was sorry, so I drove him home.
3            Typically when I drive him home, I
4   would help him with the groceries.  I just
5   couldn't do that.  And the pain was getting
6   worse, so I needed to go to the hospital to
7   have it checked out.
8       Q.    And which hospital did you go to?
9       A.    I went to Beth Israel.
10      Q.    Beth Israel?
11      A.    Yes, Beth Israel.  It was the
12  closest.
13      Q.    And were you seen at Beth Israel by a
14  doctor?
15      A.    Yes.  I was seen.  I was seen by a
16  doctor at the emergency room.
17      Q.    And what did the doctors tell you?
18      A.    You know, the standard procedure.
19  They took my temperature and everything, and he
20  checked it.  And I think he wanted me to do an
21  x-ray to see if my back was broken.

```
23        A.    I don't remember.  But the last
24   discussion with her was to follow up with my
0029
 1   primary care physician if I have it.
 2        Q.    Did you follow up with your primary
 3   care physician?
 4        A.    Yes, I did.  The next day the pain
 5   was still there, and I followed up with him.
 6   And he was more concerned about my mental
 7   health state and wanted me to see - and
 8   recommended me to see a therapist.  He also
 9   give me pain medications.  I think originally
10   it come from the Beth Israel Hospital.
11        Q.    And who was your primary care
12   physician?
13              MR. PADOLSKY:  I'm going to object.
14   We're getting a little far astray of what is
15   likely to lead to information that is relevant
16   to the case that we're here for.
17   BY MR. AMES
18        Q.    You can answer, Mr. Ebowe.
19              MR. PADOLSKY:  And I'm not sure
20   that it's appropriate for you to be asking
21   about things that are far afield of the scope
22   of what might be admissible at trial in this
23   case.
24              So I'm not sure that it is
0030
 1   appropriate that you would ask him to answer
 2   questions like that when we're here on a
 3   deposition in the Baez case.
 4   BY MR. AMES:
 5        Q.    Mr. Ebowe, you can answer.
 6        A.    So the question again, please?
 7        Q.    Who is your primary care physician?
 8        A.    At the time my primary care physician
 9   was Doctor Thomas Castiglione.  He was from
10   South Shore Medical Hospital.
11              MR. PADOLSKY:  Brooks, I'm going to
12   ask you to explain for the record how that is
13   in any way relevant to Baez in case this has to
14   be raised with the Judge.
15              MR. AMES:  What is?
16              MR. PADOLSKY:  Who Mr. Ebowe's
17   primary care physician is.
18              MR. AMES:  We are going to get -
19   later in this deposition we will get into the
20   police investigation which relied on
21   Mr. Ebowe's medical records.
22              And those are relevant to the
23   investigation that the police conducted of this
24   racial profiling complaint.
0031
 1              And the racial profiling is a
 2   central part of the litigation - the Baez
 3   litigation and the investigations conducted by
```

```
 5                 And whether they're complete,
 6   whether they're not complete, whether they're
 7   inaccurate is all part of the case.
 8                 So I'd appreciate the opportunity
 9   to depose the witness without obstruction.
10                 MR. PADOLSKY:  Respectfully, it's
11   far from obstruction.  The relevance of who
12   Mr. Ebowe's primary care physician at this
13   point, outside of what you're saying will
14   become part of the record, is not clear at all,
15   but go ahead.
16   BY MR. AMES:
17       Q.    How do you spell - do you know how to
18   spell the physician's last name?
19       A.    I could look it - it's Castiglione.
20   I have to look it up online.
21       Q.    That's okay.  That's okay.  Were you
22   given a diagnosis?
23       A.    Yeah.  They just give me a report.  I
24   don't remember the specifics there.
0032
 1       Q.    What else connected to this incident,
 2   this July 7th, 2016, incident?
 3       A.    Yes.  So if I can quickly backtrack
 4   to the parking lot.
 5       Q.    Yes.
 6       A.    One very important information I
 7   forgot was when he was talking to me after I
 8   got up before he gave me his card, that was
 9   when I realized he thought I was breaking into
10   my car, because he told me there has been a lot
11   of break-ins in Brookline.
12                 That was when the picture became
13   clear to me that the officer confronted me
14   because he thought I was breaking into the car,
15   because that was not my mindset initially.
16       Q.    Did he tell you why he thought that
17   you were - well, you assumed that he thought
18   you were breaking into your car?
19       A.    No.  What he told me --
20                 MR. PADOLSKY:  Objection to the
21   question.
22                 THE WITNESS:  Why?
23                 MR. PADOLSKY:  I'm just putting in
24   an objection for the record.  You can answer it
0033
 1   if you understand it.
 2                 THE WITNESS:  Now he - when he told
 3   me, I hope you can understand, I said, No.  I
 4   don't understand.
 5                 He said, There have been a lot of
 6   break-ins to cars in the neighborhood - in the
 7   neighborhoods, to that extent.
 8                 You know, I really - I can say my
 9   initial thought, like I said before, was I
10   wasn't too upset because I thought they were
```

12          That was my initial thought.  So if
13     that was the case, then the officer can, you
14     know, stop me and stuff like that.
15          But when he told me, Oh, there have
16     been a lot of break-ins in the neighborhood, so
17     what I got out from that information was that I
18     was breaking into my car.
19          That was how that information came
20     to me.  So fast forward to the doctor's office.
21     I went to the therapist and told her, and I
22     attended therapy session for a while.
23          So she was not very - she was as
24     helpful as she could be.  Then I sought therapy
0034
1      as we - I attended for almost two years,
2      something like that.  So that was the medical
3      background for the follow up of the situation.
4      BY MR. AMES:
5          Q.   Did you make a claim for benefits
6      arising from being out of work?
7          A.   No.  I was still out of work, but I
8      think I had to use my - because the work said I
9      could stay out as long as I could, you know,
10     and to return when I'm feeling better.
11          So everything was done through work.
12     I did not go out and make a benefit or make a
13     general request.
14          So work was very supportive with
15     respect to how I got paid and stuff like that
16     and was supportive of the - of me given the
17     incident that happened.
18          Q.   Did any police officer give you any
19     information about filing a complaint?
20          A.   No.  I don't remember.  But, like I
21     said, the detective gave me his card if I
22     needed to reach out, gave me his card and stuff
23     like that.
24          There was no discussion about, Oh, go
0035
1      file a complaint if you want.  Again, I just
2      wanted him to leave.  That was my intent.
3          You know, I just wanted to take care
4      of myself.  And, you know, as I said, it was
5      traumatic to me.  I just wanted to take care of
6      myself.
7          Q.   Why did you think you had been
8      stopped?
9          A.   Like I said before, when I saw the
10     police officer I told - you know, I thought I
11     was stopped because he was after somebody that
12     looks likes me.
13          You know, in my mind, I was thinking
14     maybe it was just a robbery or something more
15     serious in the neighborhood, and they are
16     looking for somebody that fit my profile.  So
17     that's why I thought I was stopped.  Yes.

```
19    not the case, why did you think that you had
20    been stopped?
21         A.   Yes.   Then I figured it out.   I was
22    devastated.  And, you know, when it turned out
23    that he thought I was breaking into my car, you
24    know, there was no other explanation that could
0036
 1    have given other than - you know, as time goes
 2    on and starting to peel off the incident, there
 3    was no other reason other than he saw a black
 4    guy standing in the parking lot and, you know,
 5    think I was breaking into a car.
 6              And that was unusual, because
 7    Brookline to me is very diverse.  I've been
 8    there.  I have worked in the neighborhood for a
 9    very long time in the communities there.  It
10    was - to me it was very bizarre.
11         Q.   Bizarre?
12         A.   Yeah.
13         Q.   Did you come to - did you consider
14    filing a complaint?
15         A.   Yes.  At this time I was working, you
16    know, I'd spoken to my wife, and, you know, we
17    have to take appropriate action.
18              Racial discrimination is something
19    that needs to stop.  You know, I don't know if
20    I can sideline.
21              I think it was that same day that I
22    was - what make me so scared is when I watch in
23    the news there was this black guy that was in
24    his car talking about he had a gun and was
0037
 1    shot.
 2              There is racial tension out there
 3    that I was following.  And that got me - you
 4    know, that got me ticked off, you know, very,
 5    very scared.
 6         Q.   And do you recall when you ended up
 7    deciding to filing a complaint?
 8         A.   Say that again?
 9         Q.   Do you recall when in connection to
10    the incident you ended up deciding to file a
11    complaint?
12         A.   Yes.  You see, I was more - again, I
13    was more focused on myself, because I was
14    really, really devastated and traumatized about
15    the incident.
16              If you know me outside of this
17    incident, you would come to understand.  So I
18    have to put myself together.
19              And my wife pretty much took over
20    that aspect of dealing with the police
21    department and the consulting with the
22    attorneys and stuff like that.
23              So to give you specific detail, I
24    have to reference the documentations.  But,
```

```
 1    again, it was within that period of time is all
 2    I can say.
 3         Q.    If I represented to you that a letter
 4    was written on your behalf asserting a
 5    complaint against the Brookline Police in
 6    January 2017, would that be consistent with
 7    your memory?
 8         A.    Yes.
 9         Q.    Can you tell me from your perspective
10    what happened after the lawyer wrote that
11    letter?
12         A.    How do you mean?
13         Q.    Did you become aware of a police
14    investigation into your complaint?
15         A.    Yes.  The only reason I know, they
16    reach out to my work to request my work record.
17    So I was informed by my work that they reached
18    out to request my work record, so I know they
19    were investigating me, too.
20         Q.    How did that make you feel?
21         A.    You know, the whole process was -
22    again, it just - it was new to me, and it made
23    me feel very sad.
24         Q.    It made you feel sad?
0039
 1         A.    Yeah.  And I thought the whole
 2    process was unfair.  That was my own thinking.
 3         Q.    Were there other things about the
 4    process that you thought were unfair?
 5         A.    Everything about it was.  I'm not
 6    talking about - I'm talking about the
 7    interaction with the police.  Everything was
 8    unfair.
 9         Yes, everything was unfair.  All he
10    needed to do was ask me what I was doing there.
11    You know, just a simple question, What are you
12    doing here?  Who are you?  That would have been
13    fair.
14         But, you know, okay.  Fine, you
15    thought I was breaking into my car.  You know,
16    I have my hands up.  You asked me to lie down.
17    Yeah, okay, maybe for security reasons.
18         But, you know, to the extent that you
19    have to put your legs on my back, that was
20    unfair, completely unfair.  All the
21    intimidation, I don't know why that would have
22    been necessary.
23         MR. PADOLSKY:  I'm sorry.  Did you
24    say back or butt?
0040
 1         THE WITNESS:  Back.
 2         MR. PADOLSKY:  I just wanted to -
 3    that's what I thought I heard.
 4         THE WITNESS:  No.  B-A-C-K.  It
 5    wasn't close to my butt.  Let me tell you that,
 6    okay.
```

```
 8    BY MR. AMES:
 9        Q.    I'm going to try to share to the
10    screen a few exhibits, and they have been
11    marked in an earlier deposition in this case.
12    Let's see how this goes.
13            So I can't tell if anybody can see
14    what I'm looking at?
15        A.    No.  I cannot see it.
16        Q.    How about now?
17        A.    Yes.
18        Q.    Mr. Ebowe, I'm going to represent
19    that this is Exhibit 33 that was introduced at
20    Ben Franco's deposition.
21            And just for the sake of the record,
22    I will scroll up and then I will scroll it
23    down, but just to show you what it is.
24            Let me get to the very beginning.
0041
 1            Okay.  Mr. Ebowe, do you see a letter
 2    dated January 5, 2017?
 3        A.    Yes.
 4        Q.    Did you see this letter before it was
 5    sent out by Certified Mail to Chief O'Leary and
 6    Patrick Ward?
 7        A.    Yes, I think so.
 8        Q.    I'm going to go back to the page I
 9    was on, because I wanted to show you a map that
10    is part of this.
11            Okay.  Mr. Ebowe, are you seeing a
12    map - a Google Map?
13        A.    Yes.
14        Q.    Do you recognize what is depicted on
15    this map?
16        A.    Yes.  I'm thinking it is Brookline.
17    Oh, Harvard Street.  Yes, I do.
18        Q.    Can you see my cursor?
19        A.    Yes, I do.
20        Q.    Do you know whether that - where my
21    cursor is, whether that's the Walgreens?
22        A.    Yeah.  That would be the Walgreens.
23        Q.    Can you tell me just using words, and
24    I'll try to put the cursor in the general
0042
 1    direction, but if you have a recollection
 2    today, do you recall where you had parked your
 3    car when you went to the Walgreens?
 4        A.    Yes.  It would have been where you
 5    have your cursor right there, yes.  That would
 6    have been my car there.
 7        Q.    Okay.  So your car would be where
 8    I've now moved the cursor right on top of a car
 9    that is depicted in the picture?
10        A.    Yes.  That would have been my car.
11        Q.    That's where you recall parking your
12    car?
13        A.    Yes.
```

15    of detail, so if you don't have a specific
16    memory, please don't guess or speculate.
17         A.    I'm talking about the general
18    vicinity.  That where I would have parked my
19    car right there.  That is my car.  That's what
20    I'm saying.
21         Q.    Do you recall, for instance, whether
22    your car was facing - and I'll just - this is
23    Harvard - this is a little - I'm not sure it is
24    a through street.  It is an alleyway street
0043
1     that is called Harvard Court.
2               Do you recall whether your car was
3     facing Harvard Court or facing the Walgreens?
4          A.    My car was facing the Walgreens.
5          Q.    Do you recall where your walk took
6     you?
7          A.    So my walk took me - usually I would
8     go right, right towards this side to the right
9     of Walgreens, all right.
10         Q.    So I'll represent that if we're
11    looking --
12         A.    The opposite side is where I would
13    have walked.
14         Q.    Oh, this way?
15         A.    Yes.  So then going out of Walgreens
16    parking lot to take my walk.  But when I came
17    back, I came through - now, if you go all the
18    way to the entrance to the end, yes, go up - up
19    a little.  Right there.  Yes.  Right there.
20              So I came - no, left a little bit,
21    left.  Okay.  Right there.  Stop right there.
22              Okay.  So when I went around the
23    neighborhood, I cross Harvard Square to the
24    opposite direction and came in from the
0044
1     opposite direction crossing Harvard Square
2     towards that tiny road right there and the
3     parking lot, yes.  So that's how I would have
4     walked.  I just don't remember the names.
5          Q.    This is called Harvard Court.  Is
6     that what you mean, not Harvard Square?
7          A.    No.  The Harvard Square is the main
8     road right there - no, Harvard Street.  I'm
9     sorry.
10         Q.    Harvard Street.  I see.
11         A.    Right, right, right.  So I went
12    opposite of Harvard Street, across the main -
13    I'm sorry.
14              From Harvard Court, if you go left,
15    all right, you are crossing the road left now,
16    what is the name of that road there?
17              Cross, keep going.  Yes.  Right
18    there.  What is the name of that road?
19         Q.    Harvard Avenue.
20         A.    Okay.  So I came through Harvard

22    parking lot through Harvard Court.  Do you see
23    how I moved here like that?
24         Q.    I see.
0045
 1         A.    Yes, yes.
 2         Q.    And how long - you said that at one
 3    point you were looking at the news on your
 4    phone?
 5         A.    Yes.
 6         Q.    Where were you on this map?
 7         A.    So I would have been right under
 8    these trees.  Do you see where you have your -
 9    see the trees in front of it?
10         Q.    Yes.
11         A.    So within the parking lot there is a
12    - you can stand there.  I would have been
13    somewhere there, yes.
14               That was where I was standing,
15    because I did notice that my client wasn't out,
16    and I stood right there, and that's where I
17    was.
18         Q.    Were you on the street or were you on
19    the landscaping?
20         A.    No.  I was on the landscaping, yeah.
21    I was not on the street.  I was on Walgreens
22    landscaping.
23         Q.    So returning to the location where
24    you said your car was parked, are you saying
0046
 1    your car was parked in that precise space?  Are
 2    you saying it was parked in that general area?
 3         A.    It was parked there.  Not that
 4    precise space.  It is going to be between - now
 5    I'm looking at the map.  My recollection now
 6    facing Walgreens, so I should be able to see
 7    the entrance of Walgreens from where I was
 8    standing, correct?  Is that what the map is
 9    showing right there?
10         Q.    The Walgreens entrance would be where
11    I'm putting the cursor here.
12         A.    All right.  Excellent, okay.  So,
13    yes.  So, yes, my car would have been right
14    there.  In that vicinity right there.  Between
15    those two spaces, because I recollect that and
16    I can recall that precisely.
17         Q.    Can you identify on this map where it
18    was that you were walked to and where you were
19    asked or commanded to lie down on the ground?
20         A.    I just walk across - okay.  Go - no,
21    no.  Straight up, yes, going straight.  Yes.
22    Right about that vicinity under that tree right
23    there.
24         Q.    So to the border of the landscaping
0047
 1    that abuts Harvard Court on the map?
 2         A.    Yes.

```
 4    from this map, but is there anything - as you
 5    are looking at this map and thinking about the
 6    incident, is there anything on this map that
 7    would be useful for us to talk about that we
 8    haven't already talked about?
 9         A.    Unless you ask specific questions, I
10    really don't know.
11         Q.    Thank you.  Were you ever - Mr.
12    Ebowe --
13         A.    Right.
14         Q.    -- were you ever provided a copy of
15    the investigation that the police had conducted
16    into your complaint?
17         A.    I don't remember seeing that.  I
18    really don't remember seeing that.
19         Q.    Let me scroll up this document and
20    ask you a couple of questions.  Do you see a
21    document that has the letterhead "Brookline
22    Police Department Office of Professional
23    Responsibility"?
24         A.    Yes.
0048
 1              MR. PADOLSKY:  I'm not seeing it.
 2              MR. AMES:  No?
 3              THE WITNESS:  I do see it.
 4              MR. PADOLSKY:  Okay.  I see it now.
 5    BY MR. AMES:
 6         Q.    It's in a memo format to Chief Daniel
 7    O'Leary from Lieutenant Paul Campbell.  Do you
 8    see that?
 9         A.    Are you asking me?
10         Q.    Yes.
11         A.    Oh, yes, I do.  Yes, I do.
12         Q.    And you see the subject of the memo
13    is, "Detective David Wagner"?
14         A.    Yes.
15         Q.    Do you, looking at this - I'm going
16    to call it a memo.  But looking at this memo,
17    does it - do you recall seeing it before?
18         A.    Yes.  I saw it.  Yes, I've seen it
19    before.
20         Q.    What do you - we can go through the
21    document, but what do you recall - what do you
22    remember about the police investigation that
23    you remember from this document?
24         A.    Yes.  I remember we did have some,
0049
 1    you know, some differences on our take on what
 2    the actual report was alluding to.
 3              There were some areas, you know, we
 4    question what was on the report, but I'd have
 5    to look at it to point out the areas.
 6         Q.    Okay.  So sitting here right now
 7    without looking at the specifics, nothing
 8    particular comes to mind?
 9         A.    No.  I have to review it directly.
```

```
11    summary - sorry, the first part of this memo is
12    a summary of the letter that your attorney sent
13    to the Town of Brookline.
14              And I'm going to scroll through that
15    to the part that reflects the investigation.
16    But let me just ask, this memo from Lieutenant
17    Campbell to the Chief indicates that the letter
18    that you wrote states that Detective Wagner
19    would not have treated - and your name is
20    blocked out - in this manner if he were a white
21    male.  Do you believe that today?
22              MR. PADOLSKY:  Objection.
23        A.    That currently my - I don't know
24    Detective Wagner.  All I know is how he treated
0050
 1    me.
 2              I wouldn't - I don't have his - I
 3    don't know him personally, but all I can tell
 4    you is the way he treated me was unfair.
 5    That's all I can say.
 6        Q.    And the next sentence there talks
 7    about serious racial discrimination issues that
 8    exist in the Town of Brookline and brings up
 9    Officers Prentice Pilot and Estifanos
10    Zerai-Misgun, refers to claims of racially
11    disparate treatment made by Dwaign Tyndal,
12    Juana Baez, Demetrius Oviedo, and Deon Fincher.
13    Were you aware of any of those issues or
14    claims?
15        A.    Before that - before the incident?
16        Q.    At any time.
17        A.    Oh, no.  After this incident I was
18    aware.  I was, you know, after I look at all of
19    this report and the incident to me and, you
20    know, like, as a casual observer, I was very
21    surprised.
22        Q.    And what was it that surprised you?
23        A.    You know, again, Brookline is very -
24    you know, it looks like a place that is
0051
 1    multicultural, again, a lot of students.
 2              Again, I have a lot of friends in
 3    Brookline from Jewish background, very nice
 4    guys, you know, Afrian-Americans.
 5              There is a lot of people that lives
 6    in Brookline.  To me Brookline was more a place
 7    of very progressive environment.
 8              And to read that there is issues of
 9    discrimination going on in this neighborhood in
10    Brookline, I was shocked.  I have to say that.
11              Because I have never seen Brookline
12    in that light given - again, given the
13    diversity in the area, you know, close to
14    Boston, students everywhere.
15              You know, it's a beautiful place.
16    You know, I was very, very surprised I have to
```

```
18      Q.    The summary says that - states that
19  the treatment of - and, again, your name is
20  blocked out - by Detective Wagner is part of a
21  continuing pattern of discrimination and
22  harassment of people of color or African
23  Americans by the Brookline Police Department.
24  Did you believe that?
0052
 1              MR. PADOLSKY:  Objection.
 2      A.    Yeah.  Based on the record, I mean,
 3  yes, of course.  Looking at the record - it's
 4  something I did not know before it happened to
 5  me.
 6              Again, looking at the record, it was
 7  was there.  It was there.  The evidence is
 8  based on the records.  Yes.  I do believe it
 9  looking at the record, yes.
10      Q.    Let me try and get into some of the
11  conclusions or findings of the report so we can
12  understand where there may be differences.
13              So just reorienting.  What you are
14  looking at now is the same memo I've been
15  showing you, and this is a part of the report
16  where Lieutenant Campbell is recounting his
17  interview with Defective David Wagner.  Do you
18  see that?
19      A.    Yes.
20      Q.    And your testimony is that you had
21  seen this memorandum - you have seen this
22  memorandum before?
23      A.    Yes.  The lawyer sent it to me after,
24  yes, to take a look at it.
0053
 1      Q.    Okay.  So Defective Wagner -
 2  according to this summary, detective -
 3  according to this memo, Defective Wagner was in
 4  uniform on on a dinner break, and he was
 5  sitting in his personal vehicle on Harvard
 6  Court.
 7              He could not say exactly where his
 8  vehicle was parked, but described it as being
 9  somewhere toward the end of the parking area
10  for the Women's Health Service facility.
11              Did you ever see where Detective
12  Wagner was parked or where he came from?
13      A.    No, I did not.
14      Q.    Okay.  And just to be clear, do you
15  understand that Dective Wagner is the Brookline
16  Police officer who confronted you in the
17  Walgreens parking lot?
18      A.    Yes, I do.
19      Q.    And according to this, Detective
20  Wagner was facing Harvard Street when he
21  observed a man, later identified as you, walk
22  south on Harvard Street from the front of the
23  Women's Health Services building and turn down
```

0054
1              Is that consistent with what we - you
2     have already testified?  Were you coming down
3     Harvard Street from the - no.  I'm sorry.  I
4     don't want to put words in your mouth.
5              I think what you testified was that
6     you came across the street from Harvard Ave.
7     to Harvard Court; is that correct?
8        A.    Yes.  Into the parking lot, yes.
9     That's correct.
10       Q.    Detective Wagner estimated the man to
11    be in either his late 20s or early 30s, but
12    wasn't certain.
13             How old were you at the time?
14       A.    Yeah, that was flattering.  I was in
15    the - I think I was in the - I was in my 40s,
16    man.
17             You know, I can't really - he
18    probably thought I was younger.  That's not a
19    bad thing on my part, but I was in my 40s.
20       Q.    Detective Wagner said the man walked
21    less than 15 feet down Harvard Court and then
22    went into the bush/tree area that separates
23    Harvard Court from the Walgreens parking lot.
24             Does that - do you contest that?  Do
0055
1     you remember that?  Do you agree with that?
2        A.    I know where I walked.  It is where I
3     described.  So how he saw me, my pattern of
4     movement, that I cannot - you know, again, I
5     just crossed Harvard Street, walked into the
6     parking lot.
7              I knew that road existed during
8     this - you know, discussing this incident with
9     my lawyer.  I never knew like Harvard Court.  I
10    never knew that was a road.
11             I just knew - I just walked across
12    Harvard Street, went to under the tree.  That's
13    what I remember.
14             So I could not have known his
15    observation and where he was watching me from.
16    I didn't see him, and I don't know.
17       Q.    Detective Wagner - I'm reading again.
18    "Detective Wagner observed that the man
19    remained in the bushes for a period of time
20    that he estimated to be 6 to 10 minutes and
21    said that the man was standing by a stone
22    pillar located near the edge of the Walgreens
23    parking lot."
24             Can you comment on that?
0056
1        A.    No.  I was not standing by a stone
2     pillar.  I was by the tree.  There is no -
3     there is a stone pillar, having looking back.
4     I think it's at the Walgreens entrance.
5              I wasn't standing close to the road,

```
 7    walk to my car.
 8              I was by the tree, and I was in the
 9    parking lot grounds, not on the road.  I did
10    not stand by the stone pillars.  There was no
11    need to stand there.
12              Because my initial - when I came
13    back, I had to see if my client is out of the
14    store so that I can drive him home.
15              The last thing on my mind was to
16    lounging around on the stone pillar.  No.  I
17    was under the tree.
18       Q.   I'm skipping ahead a little bit.  The
19    memo states, "When the man walked into the
20    parking lot, Detective Wagner said he saw
21    something in his back pocket that was shiny and
22    he believed may be a screwdriver."
23              Did you have anything in your back
24    pocket?
0057
 1       A.   No.  There was nothing that was in my
 2    back pocket that was shiny.
 3       Q.   You mentioned that you had taken some
 4    screwdrivers out of the trunk of your car.
 5    Were those screwdrivers in boxes or how --
 6       A.   It was a pack of precision
 7    screwdrivers.  It was red, blue, and I think it
 8    was green.  They're very colorful screwdrivers.
 9              If you are looking at them from a
10    distance, you cannot tell they are
11    screwdrivers.
12              You'd think they're Lego toys.
13    That's how beautiful they were.  And they were
14    in my car.  Not in my pocket.
15              So until I got to the car, opened my
16    trunk, and took out the screwdrivers from my
17    car, they were not with me.
18              Even if they were, they were not
19    shiny.  They were colorful, precision
20    screwdrivers.
21              So I contest that statement from
22    Detective Wagner that I have some shiny objects
23    in my pocket.  There was nothing shiny in my
24    pocket, none.
0058
 1       Q.   The memo states, Detective Wagner
 2    said the man - "Detective Wagner continued to
 3    watch this man and observed him go to a vehicle
 4    and open what he believed to be the driver's
 5    side door of the vehicle.
 6              "Detective Wagner said the man did
 7    not get into the car, however, and that the man
 8    then shut the door and walked to the rear of
 9    the vehicle and opened the trunk area.
10              "He said that the fact that the man
11    had opened the door but not entered the vehicle
12    and then gone to the trunk raised his interest.
```

14     be looking for items of value.  And not seeing
15     any in the front of the vehicle, he may have
16     been going to the trunk area to look further."
17              First off, did Detective Wagner ever
18     tell you any of this at the - on the date of
19     the incident?
20        A.    No.  And can I say more?
21        Q.    Yes.
22        A.    If Detective Wagner was observing me,
23     he should have completely noticed that I went
24     to my trunk before going to the front of the
0059
1      car.
2               If my screwdriver was in the trunk of
3      my car, then I went there first, opened the -
4      to open the trunk, I have to open the car with
5      my key, see.
6               So when I opened the trunk, you could
7      have seen all of the light flash.  If he was
8      observing me, he would have noticed that I
9      opened the car with the lights on - coming on
10     and the noise.
11              He probably didn't, but you should
12     see the lights.  I opened the trunk, brought
13     out the screwdriver from a bag in my trunk.
14              So it was very clear.  If he was
15     really looking at me, he would have seen that I
16     brought out a bag and brought something out of
17     the bag, closed the trunk, went to the front of
18     the car, and came out of the front of the car
19     without that same object in my hands.
20              So the idea that I went to the front,
21     went to the back, and then went back to the
22     front, that is not correct.  I'm sorry.  That
23     was wrong.  That was not what happened.
24        Q.    The memo continues stating,
0060
1      "Detective Wagner was unsure this was, in fact,
2      the man's vehicle, so he exited his vehicle and
3      approached him.
4               "He said that he called out to him
5      from a distance of about 25 feet and identified
6      himself by saying, 'Brookline Police.'"
7               Can you comment on that?
8         A.    No.  That is wrong.  He didn't
9      identify.  In the first place, he was in a
10     police uniform.  He did not identify himself.
11              He was very close to me, and he was
12     stoic, and I thought he was going to shoot me.
13     Again, I have friends who are police officers.
14              You know, I know police officers.
15     I'm not the kind of guy that would be afraid
16     when I see a police officer.
17              His demeanor was very different.  So
18     that was why I came to the conclusion that this
19     guy is after somebody that looks like me.

```
21        and it must be very serious.  He didn't say
22        anything.  All he asked me to do was don't - he
23        commanded me to be - not to say a word.
24                  There was no, Oh, yeah, I'm the
0061
 1        police.  No, he did not.
 2             Q.   He said - I'm continuing to read.
 3        "He said the man made a half turn of his body
 4        and looked at him and that he look startled.
 5                  "He said that as the man did this, he
 6        also appeared to take a small step away from
 7        him, which caused him concern.
 8                  "He was still unsure of exactly what
 9        the situation was, but said that it appeared to
10        him that the man may be thinking of running."
11        Can you comment on that?
12             A.   So --
13                  MR. PADOLSKY:  Objection.
14        BY MR. AMES:
15             Q.   You can testify.
16             A.   From my recollection, there was no
17        evidence.  From my recollection, there was no
18        attempt on my part to run.
19                  When I turned around, like I said,
20        you know, and he asked me to raise up my hand,
21        I followed his instructions.
22                  In my mind, looking at his demeanor
23        and fearing for my life, I was - I had to play
24        it safe.
0062
 1                  That was what was going through my
 2        mind.  Because I knew any slight mistake and
 3        looking at his demeanor, this guy would shoot
 4        me.
 5                  That was the only thing that I had on
 6        my mind.  And there was no ground to run.  I
 7        mean, we were so close to each other that that
 8        was not even a consideration, to run.  Run for
 9        what?
10                  You know, so that I objected to when
11        I saw this.  To say, oh, he was going to -
12        running from what?
13                  So that I did not see any reason why
14        Detective Wagner would have thought I was going
15        to run when I was following his instructions to
16        the T.
17             Q.   "Detective Wagner said he knelt next
18        to the man who was lying on his stomach.  He
19        said that at no time did he place either his
20        foot or knee on him or use any force on him
21        whatsoever."
22                  Is that accurate?
23             A.   He did not put his knee on my back.
24        He was putting his boot.  He was standing on my
0063
 1        back.
```

```
 3    is different from what happened to me.  He did
 4    not kneel on my back.  He stood on my back.
 5    There's a difference between knee and boot.
 6    That was what happened.
 7         Q.    I'm moving ahead a little bit here.
 8    Detective Wagner said that you were allowed up
 9    within 20 to 35 seconds of the arrival of
10    Officer Keaveney.
11              Do you recall when you were allowed
12    to get up in connection with --
13         A.    It wasn't 20 to 35 seconds.  Look at
14    his record - look at the record of his calling
15    and the arrival of the officers.
16              He had his boot on my back throughout
17    the whole ordeal.  There was no - that could
18    not have been possible even just looking at the
19    record, the timing, the call-in timing, and the
20    arrival of the other officer.
21              He had his foot on my back throughout
22    the ordeal.  He immediately step on my back.
23    Did not take his foot off until, you know, I
24    spoke to the other officers and they
0064
 1    established that that was my car.
 2              So that is - we looked at it before.
 3    That was wrong.  Just looking at the timing of
 4    it.  It felt like forever.
 5         Q.    Now, this section that's on the
 6    screen right now, the paragraph that's on the
 7    screen right now is describing an apparent
 8    dispute between the account in the letter
 9    written by your lawyer and Detective Wagner's
10    recollection.
11              And it has to do with whether or not
12    you gave him your wallet or you gave him your
13    license.  Do you see that?
14         A.    Yes.  I'm looking at it, yes.  I did
15    not give him my wallet.  I gave him my license.
16    I told him I'm bringing out my wallet in my
17    pocket.
18              The reason I would say that is so he
19    doesn't shoot me.  I just - I was just this guy
20    looks like - you know, I was still in that
21    mode.  Again, with everything that was going
22    on, I had to play it safe.
23              And my only way to safety is to
24    deescalate the situation, to make sure I follow
0065
 1    his instructions, and I don't appear as a
 2    threat to him.
 3              So those are what were going on in my
 4    mind.  So when I was - when I brought out my
 5    wallet, I showed it to him.
 6              I thought it was - you know, so this
 7    is my wallet.  So I opened the wallet and give
 8    him the license.
```

```
10    give him - when I get it pulled out, you know,
11    when I did have it, I showed him, you know.  I
12    know you don't give him your wallet.  You have
13    to give him your ID.
14              I learned that - learned that in my
15    lifetime.  So why should I hand the police
16    officer my wallet?  For what?  There is no
17    need.  I gave him the driver's license.
18              So that was - so that was a position
19    from my point of view is totally not what
20    happened.
21       Q.    According to the memorandum,
22    Detective Wagner says that he explained to you
23    why he had approached and stopped you.
24              He said he specifically told you that
0066
1     he had observed you in the bushes near the
2     stone pillar by the edge of the parking lot and
3     that he was right - and that you were right
4     next to an abortion clinic.
5               Is that accurate?
6        A.    That is inaccurate.  First of all, I
7     knew there was an abortion clinic during this
8     incident.  Why would I go looking - I never
9     knew there was an abortion clinic there.
10              Secondly, Detective Wagner said
11    nothing other than, I hope you understand.  If
12    it was actually explained to me, I'd say, Oh,
13    well, you know, this is what happened.  You
14    know, there is a mistake.  People - mistake
15    happens.
16              I would not be as angry or frustrated
17    by the incident.  It is just it was so casual
18    as if this should be automatic to you.
19              You know, I'm not just another guy
20    who goes out there, commits crime, and is used
21    to police officer.
22              You know how many times I have been
23    arrested by a police officer in my entire life?
24    Zero.
0067
1               I don't have any criminal record.  I
2     pay my taxes.  I do the right things in life.
3     So don't come to me and say, Oh, well.  How am
4     I going to understand?
5               You think I deal with the law at that
6     level?  No.  I don't understand.  I don't
7     understand the justice system with respect to
8     going to prison.
9               I don't understand criminal, because
10    I don't involve myself in this.  So he never
11    said with no explanation, I hope you
12    understand, and he left.  There was this much.
13              You know, he didn't explain to me,
14    Oh, this why.  No.  He just, you know, had an
15    attitude of this should be normal to you.
```

17  confusing me for criminals.  That's not my
18  lifestyle.  So he did not tell me anything.
19  Give me any explanation about why he arrested
20  me.
21       Q.    Did anybody say something about
22  break-ins in the area?
23       A.    He said that.  He said that.  And he
24  said that when he was leaving.  It is not, Oh,
0068
1   there were break-ins.  No.
2            There has been a lot of break-ins
3   here after he handed me my card.  So there was
4   no - there was no, you know, this was a
5   mistake.  There was nothing like that.
6            It was just so - to him, it was so
7   normal.  You know, it is this should be your
8   life.  That was my recollection of the
9   incident.
10           There was no, Oh, I'm sorry.  No, no,
11  no.  It is okay.  I am just doing my job.  It
12  is something you should be used to, and I hope
13  you understand.  That was how he came across.
14           There was no - you know, no
15  apologies, nothing like that.  I hope you
16  understand, and he left.
17       Q.    I'm going to go through this
18  paragraph carefully, because it - we may have
19  covered some of this ground, but it is areas
20  that he specifically says that - Detective
21  Wagner specifically contests the account that
22  your lawyer provided.
23           He reasserted that at no time did he
24  touch you with either his foot or knee.  That's
0069
1   inaccurate, yes?
2        A.    That is inaccurate.
3        Q.    He also said that you got on to the
4   ground on his verbal command, and he said he
5   did not walk him 45 feet to the edge of the
6   parking lot.
7            What is your testimony about - I
8   think I understand that you said that he had
9   you walk across the parking lot to where the
10  landscaping was on the border of Harvard Court?
11       A.    That is correct.
12       Q.    Do you know where the 45 feet comes
13  from?
14       A.    So we look at the distance between my
15  car crossing the road within the parking lot to
16  the other parking - to where he asked me to lie
17  down.  The calculation was about 45.  That was
18  where that came from.
19       Q.    Okay.  Wagner says he never told you
20  to get on the ground spread eagle.
21       A.    So I just lay on the ground because
22  he was standing by me?  Is that what his

24            You know, he asked me to lie down.
0070
1     There was no reason I would lie down unless he
2     asked me to.  So what am I going to do, just
3     drop down and say, Oh, let me lie - come on,
4     man, you know.
5          Q.    Detective Wagner --
6          A.    He asked me to lie down, spread
7     eagle, face down, and that was his command.  He
8     was very, very clear.  There was no mistake
9     about it.
10         Q.    Detective Wagner said he did not
11    conduct this investigation with his hand on his
12    firearm, and at no time did he order the man to
13    keep quiet or to not say a word.  Do you agree
14    with that?
15         A.    I disagree.  Because that was what
16    happened.  He had his hand on his gun.  That
17    was what I saw.  That was what happened.  He
18    had his hand on his gun.
19            If Detective Wagner did not appear
20    aggressive - appear aggressive, we would have -
21    we would have had a discussion, and he would
22    have let me go.
23            He just was giving commands.  Again,
24    I didn't know what was going on.  He had his
0071
1     hand on his gun.
2            Like I said, it's not the first time
3     I've seen a police officer.  You know, I've
4     spoken to a police officer before on friendly
5     grounds.
6            I have friends who are police
7     officers.  Except Detective Wagner's demeanor
8     was very different.
9            It was serious.  And I knew if I made
10    any error - slight error, his gun was going to
11    - I was going to be dead.  That was what was
12    going through my mind.
13            Again, my effort was to deescalate
14    the situation to show Detective Wagner that I'm
15    not a threat.
16            That whoever he was looking for, even
17    if he looks like me, I'm not going to do
18    anything to threaten his security so that I am
19    safe under the circumstances.  That was what
20    happened.
21            He didn't come in as so friendly,
22    smiling.  No.  He was serious.  This was
23    serious business, and I could see that.
24            That is the first time I have ever
0072
1     seen a police officer looking like that.  He
2     was very, very serious.
3          Q.    I'm going to keep proceeding on this
4     paragraph.  He said that upon the arrival of

```
 6   almost immediately.
 7            At no time were you told to sit on
 8   the ground with your palms down, and at no time
 9   were you sitting during this stop.  Can you
10   respond to that?
11        A.    Again, different interpretation of
12   what happened.  He had his feet on my back, and
13   he didn't let me up even when I saw the other
14   officers.
15            When they asked this question about,
16   you know, the car, and, you know, these
17   questions we discussed, his feet were still on
18   my back.
19            So when he took his foot off, you
20   think I'm just going to stand up and yell, Hi,
21   Officer?  I was still scared.
22            You know, he still had his hand on
23   his gun, you know.  And, again, this
24   description to me, this is completely wrong,
0073
 1   you know, given what happened at that time.
 2            I sat on the ground.  I followed his
 3   command carefully.  Again, I'm trying not to
 4   get shot.
 5            You know, I'm trying to save my life.
 6   I do it - you know, with my client, I have
 7   taken training on the deescalation and how to
 8   handle emergency situations.
 9            And that is what I was doing to make
10   sure I did not appear as a threat.  So when I
11   was getting up, I didn't just jump right up,
12   you know.
13            I have to sit down, follow his
14   command, make sure every step of the way I did
15   not come off as a threat.
16            So he - this recollection on his part
17   to me was false.
18        Q.    He said you did not narrate your
19   movements as you claim.  And although you
20   claimed that other officers spoke to you, the
21   only other officer who had any interaction with
22   you was Officer Keaveney.  No other officers
23   exited their vehicles.
24        A.    I saw - so Officer Keaveney would
0074
 1   have been the officer that was by my car,
 2   correct?
 3        Q.    Yes.
 4        A.    All right.  I saw him from the
 5   ground.  And I spoke to him from the ground
 6   when Detective Wagner still had his foot on my
 7   back.
 8            Every interaction we had was from
 9   that level, all right.  So after that, then
10   that was when I noticed that there was more
11   than one officer.  There was a couple of
```

13    everything.
14          So, you know, I really don't know
15    where his recollection came from.  Again, the
16    interpretation of - I would argue that that did
17    not happen.
18          Q.   In the next sentence Detective Wagner
19    disputes that the car chirped and the lights
20    flashed.
21          Is that - he says that the lights did
22    not flash and that the car did not chirp.  Do
23    you know what he means by "chirp"?
24          A.   I understand.  That's why I said it

0075

1    makes a sound when I turn it on.  I completely
2    understand.
3          You know, go to any, you know,
4    dealership, look at a 2015 Nissan LEAF, you
5    know, immediately when you get close to the
6    car, you have the key in your pocket, you can't
7    open the car without it chirping and flighting
8    that light.
9          So when I went into the trunk -
10   because when I left, the car was locked.  So
11   when I went into the trunk, and I opened the
12   trunk, the car chirped and the light flashed.
13         If he did not see it from his point
14   of view, that I cannot speak to, but that was
15   what happened.  That is what always happens
16   when I go to the car.
17         Q.   Now, Detective Wagner also says that
18   you were not by the front of the vehicle at the
19   time of the stop, but you were - you had just
20   gone to the rear of the vehicle when he
21   approached you.
22         A.   That was - that is not correct.
23   Because I took the object from the rear of the
24   vehicle and left it in the front.  So that I

0076

1    would say his recollection there is wrong.
2          Q.   Detective Wagner - I'm summarizing.
3    Detective Wagner is aware that you have alleged
4    that you were shaking and in physical pain as a
5    result of this encounter.
6          And he said that you were not shaking
7    and did not appear to be in any physical pain.
8    Were you shaking or can you tell me about this
9    aspect?
10         A.   Yes.  Of course I was shaken by the
11   experience.  You know, I was in physical pain.
12   How would he have known that?  Did he have
13   somebody put a foot on his back?  How would he
14   have known?
15         If a police officer ask you to lie
16   down and have his boot on your back, so, you
17   know, again, this goes to what I said earlier,
18   like this is - this should be normal in my

```
20            This goes to - when I was reading
21   this report, it is something I do every day,
22   you know.
23            It's so okay that this experience -
24   oh, yeah, I hope you understand.  This goes to
0077
 1   that point.  This is - that is so far off, you
 2   know, from - you know, whatever the insinuation
 3   is is so far off from the way I live my life,
 4   you know.
 5            I work with my church - my Catholic
 6   church to distribute needed items to the poor.
 7   When I go to Africa, I view schools for
 8   children who are orphans due to the HIV AIDS
 9   crisis.
10            I work with women who have been
11   disenfranchised by war.  That's the kind of
12   life I live.  So don't tell me, Oh, I wasn't
13   shaking as if I deal with this every day.
14            That is not my life.  You know, I
15   would never see a police officer and I'm scared
16   of him.  For what?  He is a police officer, a
17   law keeper.
18            You know, I respect police officers,
19   and I appreciate what they do.  I'm not the
20   kind of person that would see a police officer
21   and be scared.  Why?
22            It's not - a police officer will not
23   confront for me unless I call him.  What
24   business am I going to conduct?  Nothing.
0078
 1            You know, but to come in and say he
 2   wasn't shaking and everything was so normal,
 3   come on, man, you know.
 4            It doesn't work like that.  It is not
 5   my life.  You know, so this is where, you know,
 6   the whole racial thing start to click for me
 7   when he say, Oh, he wasn't shaking.  He looks
 8   calm.
 9            Are you serious?  You know, to me his
10   recollection - if he takes it that way, then he
11   has to look, you know, start to have a
12   different view of the people he knows.
13            I am not in the category of the
14   broadest, intensive criminal.  Let me just put
15   it straight up.  That's all.
16            If he see - you know, he see an
17   African American, oh, he is going to be used to
18   the justice system.
19            No.  I'm too far away from that to
20   come to the conclusion of that.  Oh, well, it
21   is routine activities for him.  I wasn't
22   shaken.  I didn't appear to be distraught.
23            No, no, no.  It is not that big - I
24   was petrified.  That's what happened.
0079
```

2      Wagner thought that you should be used to this
3      sort of police interaction because you were an
4      African American?
5           A.    Yes.  From what he is saying.
6                 MR. PADOLSKY:  Objection to the
7      question.
8      BY MR. AMES:
9           Q.    You can answer.
10          A.    Yes, I do, from this report.  What
11     else can I conclude?  When he said I wasn't
12     shaking.  I wasn't in pain.  It was just, Hope
13     you understand.
14                What am I going to conclude from
15     that?  That is my impression.
16          Q.    Forwarding ahead a little bit.  He
17     indicates that he believed he had ended the
18     stop on good terms with you and that your
19     conversation at the conclusion of the stop was
20     positive.  Do you agree with that?
21          A.    No, I don't, because I made it very
22     clear to him that I don't understand the
23     situation.
24                There was nothing positive about it.
0080
1      You know, it was very, very clear.  If he
2      thought it was, why did he, you know, said he
3      was was going to have to put a report in.
4                 No.  He knew this was a serious
5      issue.  I told him very clearly that I had
6      never been roughed up by a police officer
7      before.
8                 You know, so I don't have this kind
9      of interaction with the police.  That was what
10     it is.  So the answer is I don't agree with
11     this assessment.
12          Q.    I'm showing you a portion of the memo
13     completed by Lieutenant Campbell.  I'm just
14     checking to see if there is a page number.
15                They don't seem to be marked by page.
16     In any event, do you see this statement that
17     Detective Wagner did not submit an FI
18     documenting this encounter?
19          A.    Yeah, I do.
20          Q.    Was that something that was explained
21     to you or did you read this in the memo?
22          A.    I read it.  But, again, I - after
23     that particular I did not interact with
24     Detective Wagner.  It was just between my
0081
1      attorney and my wife, who was pretty much - you
2      know, she worked with litigation and stuff like
3      that, so she did explain that.
4                 I saw those in the report.  I didn't
5      interact with him.  I did not have any
6      discussions, so, no, he did not explain
7      anything of that nature to me.

```
 9    is - can everybody hear me?
10         A.    Yes.
11         Q.    Do you see in the report here it says
12    - or the memo I've been calling it - it states
13    that Campbell does have two prior complaints
14    alleged, one in 2011 and another in 2015?
15         A.    Yes, yes.  I see it.  Okay.
16         Q.    And were you aware of that before
17    today?
18         A.    Say that again, please?
19         Q.    Were you aware before today that two
20    prior --
21         A.    Yes.  I'm aware of that because I
22    read the report after.
23         Q.    Were you ever given any detail as to
24    the nature of those or the details of those
0082
 1    complaints?
 2         A.    I wouldn't say that, because even if
 3    I did, I cannot recall.
 4         Q.    Let me show a different document
 5    here.  This is a - I'm not sure why it was
 6    copied this way, but this is a document that I
 7    have.  And it is faint, but you can see at the
 8    top it has been marked as Exhibit 27.
 9               And this is part of a prior
10    deposition.  So this is Franco 27.  And I'll
11    represent that this was a prior complaint of
12    racial profiling made against Detective Wagner.
13    Did you ever see this report?
14         A.    I was told they had the prior
15    complaints against him.  Again, I've seen all
16    of these.
17               But would you please keep in mind
18    that after the incident I was more focused on
19    my recovery.
20               And if I saw things, I don't
21    remember.  My focus was on my recovery from a
22    traumatic experience.
23         Q.    Okay.  So I'm going to step away from
24    that report and show you another one, and this
0083
 1    one is marked Franco 28.
 2               And just scrolling through it a
 3    little bit.  Did you ever see this complaint
 4    that was made against Detective Wagner for
 5    racial profiling?
 6         A.    Again, I don't recall, but I knew he
 7    had a couple of complaints against him.  That
 8    was what I was told by my attorney.
 9         Q.    Okay.  I'm now on Franco 29 -
10    Exhibit 29.  This is a confidential settlement
11    and general release agreement.
12               And I'm going to scroll through a
13    little bit of this document.  There is
14    something called Exhibit A.  Do you see that?
```

16        Q.    Just take as long as you need, but do
17   you recognize what that is?  Have you seen that
18   before?
19        A.    No, I don't think so.
20        Q.    Let me read it to you.  Dear Mr. -
21   and then --
22        A.    Oh, I don't mean to cut you off.  I'm
23   sorry, Lawyer, excuse me.  I do recognize it
24   now.  I have looked at it definitely.  I
0084
1    recognize it.
2         Q.    And what is this?
3         A.    I think it was kind of a letter, and
4    the Chief of Police of Brookline as part of the
5    settlement, you know, from our end, we do - I
6    do recognize this as an apology letter, but
7    there was no apology that was exclusively
8    stated, but that was what I requested.
9              And I think this is the best letter
10   they could have issued close to the apology
11   letter that I requested as part of my
12   settlement.
13             MR. PADOLSKY:  It looks like we
14   lost Brooks.
15             MR. AMES:  Joe, are you back in?
16             MR. PADOLSKY:  I've been here the
17   whole time.
18             MR. AMES:  I'm not sure when you
19   lost me, but I stopped being able to hear
20   Mr. Ebowe partway through his last answer, and
21   I was - when we got off, I was asking the court
22   reporter if she had captured the answer - the
23   last answer.
24
0085
1              (Answer read.)
2
3    BY MR. AMES:
4         Q.    Is Mr. Ebowe back in the Zoom?
5         A.    Yes, I am.
6         Q.    Oh, there you are.  Thank you.  I'm
7    very close to being finished.  I apologize for
8    the - I'm not sure why it cut off, but let me
9    see if I can get back to the exhibit.
10             Is everybody looking at the exhibit
11   again?
12        A.    Yes.
13        Q.    So do you recognize this document as
14   the settlement agreement that you entered into
15   with the Town of Brookline?
16        A.    Yes.  That looks like it to me,
17   correct.
18        Q.    And do you recall that as part of the
19   settlement, the Town of Brookline will
20   implement the ADL training managing implicit
21   bias within the police department on a

```
23      in-service training program subject to
24      availability and scheduling with the ADL?
0086
 1           A.    Yes.
 2           Q.    Was that something that you wanted?
 3           A.    That was what I recommend -
 4      requested, yes.  That was something that I
 5      wanted.
 6                 MR. AMES:  I don't have any more
 7      questions for Mr. Ebowe.  I will say that Joe
 8      may have some questions, but I want to say now,
 9      before I conclude my questioning, that we do
10      have a protective order in this case that any
11      party can utilize to designate portions of
12      transcripts as confidential.
13                 And there were parts of the
14      discussion where you discussed therapy, medical
15      records.
16                 And if you wish to make those
17      portions of the deposition confidential under
18      the protective order, that's your right.
19                 And I just want to make sure before
20      I conclude my questioning that you know that.
21      And that can be coordinated after the official
22      transcript is prepared.
23                 But I guess I'll leave it right
24      there for now and see what Mr. Podalsky has for
0087
 1      questioning.
 2                 MR. PADOLSKY:  So we actually don't
 3      have a protective order, although we should,
 4      and I don't have any objections to what you're
 5      saying.
 6                 And I would imagine that whatever
 7      order we enter into will look a lot like
 8      protective orders that we have entered into in
 9      the past in other litigation where we have been
10      counsel together.  But I do have a few
11      questions.
12
13
14
15      EXAMINATION BY MR. PADOLSKY:
16           Q.    So, Mr. Ebowe, I was going to you ask
17      you, you said you have family or friends that
18      are police officers.
19           A.    Yes.  Not family, friends.  Yes, I
20      do.
21                 MR. PADOLSKY:  Before we get going
22      - off the record.
23
24                 (Discussion off the record.)
0088
 1      BY MR. PADOLSKY:
 2           Q.    So you said you had family or friends
 3      that are police officers?
```

```
 5          Q.     I'm sorry.  Hold on.  I'm sorry.  I
 6     don't know what's going on here, but one of the
 7     detriments of having Apple products is if one
 8     thing goes off, then all of a sudden my
 9     headphones get inundated with what's happening
10     on my phone instead of what's happening on the
11     screen.
12             So I didn't hear what you said when I
13     asked you about your friends and family that
14     are police officers.
15          A.     I said I have friends that are police
16     officers, yes, that's correct.
17          Q.     Where is he a police officer?
18          A.     There is one in Kingston here, a
19     local police officer here, and there is another
20     one that is out of Boston.  Oh, yeah, sorry, he
21     is a Boston Police officer.
22          Q.     Are you getting advice from someone?
23          A.     I just am looking at my notes.  I
24     just didn't remember their names - their last
0089
 1     names.
 2          Q.     Is there someone else that is in the
 3     room with you though right now?
 4          A.     No.  But I have my file in front of
 5     me.
 6          Q.     So you have a friend in Kingston and
 7     a friend in Boston?
 8          A.     Yes, who is a Boston police officer.
 9          Q.     Any other friends that are police
10     officers?
11          A.     Yeah.  One of a family friend who is
12     a judge has a sister - has a brother who is a
13     police officer.
14          Q.     I'm sorry.  Whose brother?
15          A.     A family friend who is a judge - is a
16     judge has a brother who is a police officer.
17          Q.     Any others?
18          A.     That's as much I know of police
19     officers.  You know, I'm talking about the one
20     I know, you know, who are very close to me.
21             But other than that when it comes to
22     folks like local police officers in Kingston,
23     you know, I do know them.
24             And whenever I see and, you know,
0090
 1     when I run into them in construction, we do
 2     some exchanges, just hi passing by, saying
 3     hello.
 4          Q.     You are talking about local police
 5     officers?
 6          A.     Yes.  Local police officers.
 7          Q.     And you do some construction work you
 8     said?
 9          A.     I said when I - no, no, no.  When
10     they are doing detail work.
```

```
12    if you see them, you'd walk by and say hi or
13    something of the sort?
14         A.    At some point I couldn't.  But I said
15    that's an older friend and, you know, during my
16    therapy - are you still there?
17         Q.    Yeah, I am here.
18         A.    Yeah, yeah.  During my therapy, you
19    know, I was having difficulties, you know,
20    dealing with the presence of police officers.
21              It is not that I hated police
22    officers.  It is just I had difficulty dealing
23    with the presence of police officers.
24              I did - knowing these police officers
0091
1     that I just mentioned, you know, they are good
2     guys.
3              And I did some of the factors I
4     worked into - you know, into my therapy to come
5     out from the other side, you know, to get
6     better from this experience, yeah.
7         Q.    So you've how long - you said that
8     you have a Kingston friend, a police officer
9     that's in Kingston that's a close friend of
10    yours?
11        A.    The police officer I'm talking about
12    was my next door neighbor.
13        Q.    And he a close front of yours?
14        A.    Yes.  He was my next door neighbor,
15    and he moved within Kingston.  You know, we
16    invite him here to Christmas party.  He stops
17    by to do my sprinkler system, so, yes.
18        Q.    And he is still a close friend of
19    yours?
20        A.    Oh, big time, yeah.
21        Q.    What about your Boston police officer
22    friend?
23        A.    Yes.  That you see when we - that I
24    run into when - I think he is retired now -
0092
1     when we have the chance with our church friends
2     there and like dinner and special occasions.
3              Again, a family - you know, I brought
4     up a family friend who went to school with my
5     wife, so that is how I came to know him, but -
6     so that is the relationship we have on that
7     side.
8         Q.    What about any relatives that are
9     police officers?
10        A.    I don't have direct relatives or
11    family that are police officers.
12        Q.    You said you do not?
13        A.    No, I don't.
14        Q.    I think that earlier you had said
15    that you had never had an interaction - like an
16    official interaction, if you will, with a
17    police officer before the July 7, 2016,
```

```
19        A.    So let me make --
20              MR. AMES:  Objection.
21        A.    Let me make myself very clear here.
22   I have never had a criminal interaction that I
23   was dealing with.
24              Have I met a police officer during a
0093
1    routine traffic stop?  Yes.  When my son had -
2    he was sick, and we had to call 911, because
3    the Boston Police - the Kingston Police showed
4    up at my house as part of the call, because my
5    son was sick and we had to have the ambulance
6    here.
7               When we had the - the other time I
8    think is when we had the winter due to, you
9    know, I thought there was - what do you call it
10   when you have fumes - the deadly fumes coming
11   out of the - carbon monoxide.
12        Q.    Carbon monoxide?
13        A.    Yeah, yeah, so they came here.  So
14   those are the kind of interaction I would have
15   with them.
16              What I'm talking about criminal
17   interaction where I've been arrested for
18   criminal activities, you know, nonroutine
19   interaction and I'm breaking the law that the
20   police is arresting me, putting me in
21   handcuffs.  Those are the interactions I'm
22   talking about.
23        Q.    Never before?
24        A.    No, ever.
0094
1         Q.    So you have had, you know, traffic
2    stop interactions?
3         A.    Yeah, yeah.  I mean, I don't fight
4    with the police.  It is a traffic stop.
5         Q.    Right.
6         A.    You see that as - you know, any time
7    I do I am respectful.  What I'm trying to tell
8    you I do not look at the police in a negative
9    light.
10              I respect the police, because I think
11   they are keeping the law.  You know, I have the
12   television.  I travel.  I see police all around
13   the world, all right.
14              And the U.S. police is no different
15   from everywhere else.  So because of that, I do
16   not see the police as the enemy of the people
17   so to speak.
18              I see them.  I treat them with
19   respect.  And whenever I can afford to, I
20   contribute to the - locally for donation for
21   the police.
22        Q.    I understand what you're saying.  I'm
23   just trying to get an understanding of any
24   interactions you might have had before July 7,
```

```
 1    2016.
 2        A.    Oh, okay.
 3        Q.    So you had, you know, some traffic
 4    stop situations.
 5        A.    Yes.  Sure, sure, yes.
 6        Q.    And then you had an incident at your
 7    house with carbon monoxide?
 8        A.    Yes.
 9        Q.    Outside of that, any other specific
10    incidents that come to mind?
11        A.    No.  None that - where I would
12    require the police for life and death
13    situation, no.  I can't recall anything.
14        Q.    Good or bad.  Any specific incidents,
15    I mean, outside of like a routine like, hi, how
16    are you?
17        A.    Okay.  A long time ago we tried to
18    organize a - this was close to the '90s.  We
19    tried to organize a local festival in
20    Springfield.
21              And the black community, because the
22    police - and we interacted with the police to
23    see - to bring unity between the black
24    community and the police officers in
0096
 1    Springfield in the Springfield Mall.
 2              When we did the festival, the police
 3    showed up, despite the objection of the black
 4    community.
 5              And the black community also had the
 6    mind that they were not going to show up
 7    because of the police, but they showed up, too.
 8              So we going to have these two group
 9    of people, you know, in that festival.  So the
10    positive interactions I have with the police.
11    That's what I'm trying to explain to you.
12              That, you know, in most cases when it
13    comes to police officers coming to - like I
14    said, when my son was sick they showed up.  I
15    was happy to see them.
16        Q.    Sure.
17        A.    Positive interactions.
18        Q.    So the 1990 Springfield festival was
19    that - that wasn't a personal interaction for
20    you, was it?
21        A.    We organized it.  I was one of the
22    organizers.  It wasn't in 1990.  It was the
23    '90s.  Make that clear.  So I have to go
24    through my record and bring to show to you.
0097
 1        Q.    No.  Your memory is fine.
 2        A.    So what I'm basically saying, you
 3    know, this was a very positive interaction.
 4    I'm just trying to explain my attitude towards
 5    police officers.
 6              To me police are friends, not the
```

```
 8        Q.    No.  I fully understand what you're
 9   saying.  So outside of the incidents that we
10   just went over, are there any other
11   interactions that you had that come to mind
12   prior to July 7, 2016?
13        A.    No.  I've never had similar
14   interactions.  You are talking about with
15   respect to police right now, correct?
16        Q.    Yes, yes.
17        A.    I cannot recall any interaction that
18   is of similar nature or something that would
19   shake me so violently that I - you know, I
20   really haven't.
21        Q.    Okay.  On July 7th, 2016, you were
22   working for the Jewish Family and Children's
23   Services?
24               MR. AMES:  Joe, can I just step in
0098
 1   for a minute, since you seem to be going into a
 2   different section?
 3               If you have, you know, more than a
 4   couple of minutes, I would like to take, as
 5   they say in England, a comfort break?
 6               MR. PADOLSKY:  Go for it.
 7               MR. AMES:  Okay.  Thank you.
 8
 9               (Recess.)
10
11   BY MR. PADOLSKY:
12        Q.    I think earlier, Mr. Ebowe, you were
13   talking about that in July 2016 you were
14   working for the Jewish Family and Children
15   Services?
16        A.    Correct, yes.
17        Q.    How long had you been working for
18   that entity?
19        A.    So I - at that time I started working
20   for them in 2008.
21        Q.    And where was that located?
22        A.    Where locate?  The office - my work
23   location was stationed at Freeman Street -
24   Freeman.  But also the way my work is
0099
 1   structured is that I was dealing with folks in
 2   the community.  So they were not situated in
 3   one location.
 4               So we have folks on Beacon Street,
 5   Freeman Street.  We have them all around
 6   Brookline and some part of Allston.  So I have
 7   to move around to meet my clients.
 8        Q.    And your clients were predominantly
 9   in Brookline you said?
10        A.    Yes.  Most of them were in Brookline,
11   yes.
12        Q.    And so everything that you were
13   describing earlier in terms of your work
```

15    Brookline?
16         A.    Yes, it does.  Most of the time.
17    Again, our corporate office is in Waltham.  We
18    do have clients and activities there.  Again, I
19    usually work outside in Brookline.  So but
20    related to this discussion, it was all in
21    Brookline.
22         Q.    So your day-to-day with clients, that
23    typically consisted of a lot of what you had
24    described with relation to taking your clients
0100
1     to certain - to perform certain activities like
2     go to the bank or go to the drugstore, correct?
3          A.    That is correct, yes.  That was some
4     of the activities.  You know, I'm dealing with
5     people whose activities - my clients were
6     people with the developmental disabilities.  So
7     what I did was I'd help them with activities of
8     daily living.
9               I would source - let's say they need
10    to clean - their apartment is dirty.  I source
11    people to come and start cleaning for them.
12              So if I have those services, I have
13    to keep on top of the services to make sure.
14         Q.    But in terms of what you were doing
15    for your clients, you'd be taking them - I
16    mean, aside from what you were just describing,
17    you would also be taking them to various places
18    like the bank or the drugstore?
19         A.    Yes.  Bank, doctor's appointment,
20    drugstores, you know, if we have social
21    activities I want them to go, and they need
22    support with it.
23              Again, none of them are very
24    independent.  So if they need support with it,
0101
1     I will go with them.  After work I would have
2     to deal with that as well.  Just the ones that
3     go to work.
4          Q.    Most of these appointments or
5     locations, were these also in Brookline?
6          A.    Yes.  Some of them in Brookline.  But
7     most of them, they work outside of Brookline,
8     so I would - the ones that come from outside of
9     Brookline, I would drive to them.
10              The ones that work - that work
11    outside of Brookline and have issues, I will go
12    and deal with them wherever they are located.
13              But, ultimately, they reside in
14    Brookline, and most of the work - bulk of the
15    work would be in Brookline, that is correct.
16         Q.    So fair to say that from 2008 - do
17    you still work with the Jewish Family and
18    Services?
19         A.    No, no.  I stopped working for them
20    last year.

```
22        A.    Yes.
23        Q.    So fair to say from 2008 to 2019 your
24   work with the Jewish Family and Children
0102
 1   Services was predominantly in Brookline?
 2        A.    That is correct, yes.
 3        Q.    And that you were in the community
 4   for the purpose of work for that entire time
 5   frame?
 6        A.    Yes.
 7        Q.    And that you were familiar with
 8   Brookline through your work?
 9        A.    Yes.  Oh, big time, yeah.  I was
10   familiar with Brookline, correct.
11        Q.    What about personally, not just
12   professionally.  Do you have any ties to
13   Brookline personally?
14        A.    Well, so this is how I would put it.
15   See, most of my clients have families, too.
16   Some of them I have come to know, and, you
17   know, I would talk with them.
18              But other than that, no, I really
19   don't have other personal connections to
20   Brookline.
21        Q.    You did say earlier that you had some
22   friends in Brookline?
23        A.    Those are the ones that I was
24   referring to.
0103
 1        Q.    The family members of some of your
 2   clients?
 3        A.    Right.  They became my friends.
 4   Talking about cousins and, you know, parents,
 5   so those were the ones that - those are the
 6   ones that I know.
 7        Q.    Understood.  I want to ask you a
 8   little bit about that July 7, 2016, day.  Do
 9   you remember what time of the day it was that
10   you had taken your client over to Walgreens?
11        A.    Yes.  It was - I would put the time
12   about 3:30, because I remember I see - when I
13   have to meet my clients, we make appointments.
14   That was when we have left home from there
15   towards the Walgreens.
16              So, again, through it, an hour for
17   him to do his shopping, but sometimes it's
18   longer.  That is just my estimation.
19              So that was when the movement started
20   from leaving the house.
21        Q.    About 3:30 though?
22        A.    Yes.  That's when we left.  But when
23   - you know, by the time I dropped him and when
24   this happened, it was very close to five, yes.
0104
 1   So it was different.
 2        Q.    And do you have a memory of the
```

```
 4        A.    It was a very bright date.  It was a
 5  beautiful day.  That was one of the things that
 6  I know.
 7        Q.    Was it a sunny day?
 8        A.    It was sunny, yeah.
 9        Q.    Now, I know this is probably going to
10  sound weird, but do you remember if there were
11  clouds in the sky or cloud covering at any
12  points?
13        A.    It was a beautiful day.  Because when
14  it was a beautiful day, I like to - you know,
15  and I have some free time, I like to take a
16  walk.
17              So if I went out taking a walk, it
18  was because it was a beautiful day.  But I was
19  not paying attention to, you know, the --
20        Q.    It's a weird question.  That was your
21  practice if it was nice out when you were
22  waiting for clients, you would go for a walk?
23        A.    I like to walk, take a walk for
24  exercise.  I do that as well.  And one of the
0105
 1  things that would make me do that is a
 2  beautiful day.
 3        Q.    And is that something that you've
 4  been doing since 2008?
 5        A.    No, again, my activities is that, you
 6  know, what I said earlier.  When you are
 7  dealing with people, which you know as a
 8  lawyer, that every day is different, you see.
 9              Because, you know, you can go there
10  today, and they are doing fine.  Tomorrow you
11  go, they have some - you might assist them in
12  response to dealing with their family.  So just
13  play it by ear.
14        Q.    Sure.
15        A.    So it depends on the day to day.  But
16  when I'm free, in this case when my client was
17  in the store, he did not need my support while
18  he was in the store.
19        Q.    I understand.
20        A.    So I had two options, so I just take
21  a walk.  So my response is it is not what I do
22  every day.
23              On that that particular circumstance,
24  I did that, taking a walk, yes.
0106
 1        Q.    Fair to say, and feel free to tell me
 2  if this isn't fair to say, but fair to say that
 3  whenever you had a chance and when it was nice
 4  out you would take an opportunity to take a
 5  walk?
 6        A.    Yes, I would.
 7        Q.    And at least as it relates to your
 8  work with Jewish Family and Children Services
 9  from 2008 to 2016, generally speaking, that was
```

11        A.    Yes.  So when I am at work, I will
12   walk around Brookline.  I do go around walking
13   the Charles, too.
14        Q.    Wherever you happen to be?
15        A.    Yeah, exactly.  So I do walk for
16   exercise.  You see what I mean.
17        Q.    No.  I understand.  I'm just trying
18   for the record to establish that essentially
19   from 2008 until 2019 when you stopped working
20   for Jewish Family and Children Services, that
21   when that opportunity presented itself in
22   Brookline, you would go for a walk?
23        A.    Oh, I do, yes.  You are right.  That
24   is correct.
0107
 1        Q.    So you said earlier that you had been
 2   to that Walgreens location many times before?
 3        A.    Yes, correct.  And at the same time
 4   brought my client there.
 5        Q.    And was that the first time you had
 6   gone for a walk at that Walgreens location?
 7        A.    The first time?
 8        Q.    Yes.
 9        A.    Oh, no, of course not.
10        Q.    It's going to sound silly, but could
11   you estimate the number of times that you have
12   gone for a walk in that exact location?
13        A.    I can't, man.  And I'm going to tell
14   you why.  I will take my - there are sometimes
15   I take my client there I don't - I can't go for
16   a walk, because the client I brought there
17   requires my assistance.
18              You see, so it's just if it's a free
19   time, it's between when the client is shopping
20   is when I go for a walk.
21        Q.    I get that.  I'm just trying to
22   understand how many times before --
23        A.    But it's more than one, I will say,
24   but it's not - I cannot tell you I went 20
0108
 1   times, 40 times, because, you know, the client
 2   - we don't go there every week.
 3              You know, we only go there when he
 4   need to.  Because the client, when they need to
 5   do their food shopping, they have, I think,
 6   Shaw's down the street.
 7        Q.    There are other things to do.
 8        A.    Yes, yes.  So we go there when, you
 9   know, when they need some specific items that
10   that are specifically cheaper to get.
11              And this particular client also get
12   his medication from that Walgreens, you see, so
13   that's why we went there.
14        Q.    Are you able to estimate the number
15   of times that you've gone for a walk in that
16   area?

```
18          Q.    If you can't say the specific number
19    of times, perhaps you could say about the -
20    talk about the frequency.  How often do you
21    think you would go for a walk in that area?
22          A.    Okay.  You know, let me give the
23    different possibilities.  So that client I'm
24    going to tell you I work with him for at least
0109
1     almost a year, all right.
2                 So let's throw it at once or twice a
3     month we go to Walgreens to do shopping, right.
4     So in that situation, maybe in summer, in
5     winter as well, if it is a good day and I'm
6     free, then I will go take a walk.
7                 You know, so, yeah.  We can put it in
8     a ballpark of, I would say, five.  That was my
9     best estimate, five times.
10          Q.    With that client in particular?
11          A.    Yes.  With this particular client.
12    Yeah.  It was the only reason I have to go to
13    Walgreens.
14          Q.    Sure.
15          A.    Yes.
16          Q.    But then with other clients you would
17    go for walks in other areas of the town?
18          A.    It depends on the client.  Because
19    some of my clients were - all of my clients
20    were very independent.
21                So, again, let's say I bring my
22    client to Beacon Street for a medical
23    appointment.  I have to stay there with them.
24          Q.    No.  I'm not --
0110
1           A.    It is not --
2           Q.    I'm only talking about --
3           A.    There is no pattern.  Oh, gee, when I
4     go, this is how many times I walked.  There is
5     really no pattern.  That's what I'm trying to
6     explain to you.
7           Q.    I'm only talking about when the
8     opportunity presents itself where your client
9     doesn't need your assistance, you would go for
10    walks in other areas as well?
11          A.    Yes.  Even when I have to take a -
12    when I have to take a little break from work, I
13    go for a walk.  You understand.  That's what I
14    do for exercise.
15          Q.    And have you been - how long have you
16    been doing that for?
17          A.    I always walk from day one.  Since I
18    was able to walk around.  I just - I still
19    walk.  I go around to Kmart, do my walking.  It
20    is just my exercise, yeah.
21          Q.    So, I'm sorry, you said "from day
22    one," and I think I understand that, but this
23    is not a normal conversation, so I have to
```

0111
1            Would you say it's at least the last
2     10, 15 - well, let's say 20 years you have been
3     doing that?
4          A.    Taking a walk?
5          Q.    Whenever you can.
6          A.    Maybe the last 35 years.
7          Q.    35 years?
8          A.    Yes.  Not only Brookline, but it's
9     what I do, like I said.
10         Q.    Wherever you have the opportunity?
11         A.    Yes.  When I have the opportunity.
12    When I lived in Cambridge after dinner I take a
13    walk to digest my food.
14            So I do walk for exercise.  It is a
15    routine for me to take a walk, yes, so that's
16    the best I can.
17         Q.    And has that routine changed at all
18    over the last 35 years?
19         A.    It did after the police experience
20    with me taking a walk.  You know, I love to go
21    to quiet places so that I can meditate and
22    reflect.
23            So you would see me walking in a very
24    quiet neighborhood, quiet times, in the woods.
0112
1            But after the police experience I
2     withdrew - I drew back a lot and I stopped
3     walking.
4          Q.    Are you walking now?
5          A.    Huh?  Yes.  Luckily I came back to my
6     routine, you know.  Therapy was very helpful
7     with walking and doing therapy.  And, you know,
8     I'm back to walking in open areas.
9            You know, the therapy worked.  It
10    brought me back to a level where I can, you
11    know, resume some aspects of my previous life.
12            But, again, you know, with a lot of
13    caution.  Something could happen some day that
14    is completely out of my control.  That was the
15    lesson I learned from there.
16         Q.    So a few other questions about your
17    background.  Did you work in any other jobs or
18    with any other companies that had you working
19    within the Town of Brookline?
20         A.    No, no.  Not within the Town of
21    Brookline.
22         Q.    Which UMASS did you go to?
23         A.    Boston.
24         Q.    I went to UMass Lowell.
0113
1          A.    Oh, gee.  That's a good campus.  I
2     went to Boston.
3          Q.    That's where my father went.
4          A.    Oh, cool, man, cool.
5          Q.    Okay.  So July 7, 2016, you're at the

```
 7                    MR. AMES:  Did you say 7?  I just
 8     heard 11.
 9                    MR. PADOLSKY:  7.
10                    MR. AMES:  Thank you.
11                    THE WITNESS:  Yes.
12     BY MR. PODALSKY:
13          Q.    And I'm not going to go over
14     everything that you have already gone over.  I
15     just want to ask you a few questions.
16          A.    Sure.
17          Q.    So you said that at some point you
18     went and you went to the pavement on your own
19     at the instruction of Officer Wagner, correct?
20          A.    I don't understand your question.
21          Q.    So Officer Wagner directed you to lie
22     down on the pavement and you did?
23          A.    During this incident, yes.  That is
24     correct.
0114
 1          Q.    And you were talking about his - the
 2     placement of his, I think you said, foot on
 3     either a part of your upper back or neck in
 4     your earlier testimony, correct?
 5          A.    That is correct.
 6          Q.    So I just - I want to see if I can
 7     make this work.  I'm going to show you - I'm
 8     going to show you just a generic image of a
 9     male individual.  Hold on a second here.  Let
10     me see if this works.
11          A.    Yes.
12          Q.    All right.  So looking at - it looks
13     a little bit look Brooks, right?
14                    MR. AMES:  I wish I had that hair.
15     BY MR. PADOLSKY:
16          Q.    Looking at this image here, I'm going
17     to put the cursor on the backside of this
18     image.  Tell me when to stop in terms of where
19     the officer's foot was.
20          A.    Okay.  There.
21          Q.    So I'm not sure for the record that
22     we're going to have this image when the
23     deposition transcript comes up.
24                    So fair to say that that place that
0115
 1     you had me stop, that's between the left and
 2     the right shoulder blades?
 3          A.    Yes.
 4          Q.    On the upper back?
 5          A.    On the upper back, yes.
 6          Q.    In the middle of the back?
 7          A.    Yes.
 8          Q.    Well, that probably screws up the
 9     record.  But in the spine area of the upper
10     back between the left and the right shoulder
11     blade?
12          A.    That is correct.  As long as the shoe
```

14          Q.     Does that sound to you to be a fair
15     description of the area that you recall the
16     shoe to be?
17          A.     Yes.  So the shoe would be right
18     there.  That's putting the middle of the shoe
19     standing up and down given the size of the
20     shoe.  It was a pretty big shoe.
21          Q.     All right.  I want to try one other
22     thing here.  I'm going to stop this for a
23     moment and come back to our regular screen
24     here.
0116
1               Can you see me now?
2          A.     I can see you.
3          Q.     Okay.  Hold on one second.  Do this.
4               So off the record for a moment.
5
6               (Discussion off the record.)
7
8      BY MR. PADOLSKY:
9          Q.     Mr. Ebowe, you said you have a 2015
10     Nissan LEAF, correct?
11          A.     I did.
12          Q.     Did it look something like this?
13          A.     Yes.  It looks exactly, but it was
14     silver, not powder blue.
15          Q.     And when I say "something like this,"
16     I'm showing you, fair to say, what appears to
17     be a paused image of a YouTube video of a 2015
18     Nissan LEAF, right?
19          A.     Okay.
20          Q.     Would you agree with that?
21          A.     Yes.  That looks like a Nissan, yes.
22     You are right.
23          Q.     And I'm going to fast forward here.
24     The screen is now showing a key fob, correct?
0117
1          A.     That is correct.
2          Q.     Is this what your key fob looked
3      like?
4          A.     It looks like that, yes.
5          Q.     All right.  I'm going to press play.
6      Just for the record, let me do this.  Let me do
7      this.  Hold on a second.
8               So for the record, the video that I'm
9      referencing is at
10     https://urldefense.com/v3/__HTTPS://WWW.YouTube.com/watch?V=
       1PGYM7J4CEC__;!!NtP9J7iH11vXGg!YTgoBrsQOSN5nVytgjQ3h-
wc5LmyYTPoi1wQrf7VZ4PpJBg0AKbct1ZmE_
       OkRHTtGDcBMRhN$ .
11               And I'm going to press play here at
12     the 50 second mark, ask you to listen to what
13     they're saying in the video.
14               And then I'll pause it, and I'll have
15     a question for you.
16

```
18                the video that was played.)
19
20              FEMALE VOICE:  It is possible to lock
21      and unlock the vehicle using your intelligent
22      key from outside the vehicle at a distance of
23      up to 33 feet.
24              To lock doors, press the lock button.
0118
 1      Your hazard warning lights will flash twice,
 2      your horn will beep once, and you will know
 3      that all doors are locked.
 4
 5              (End of video transcription.)
 6
 7      BY MR. PADOLSKY:
 8          Q.    Mr. Ebowe, did you hear that part?
 9          A.    I do.
10          Q.    And did you hear that - does that
11      sound - does that sound to be accurate in terms
12      of the way that your remote key fob worked in
13      your vehicle worked?
14          A.    So, yes, you can lock it from a
15      distance as long as you have the key in your
16      pocket.
17          Q.    Did that portion of the video sound
18      accurate as it relates to your vehicle?
19          A.    That you can open it - that you can
20      unlock it from a distance?
21          Q.    Yes.
22          A.    Oh, yes.
23          Q.    And that the light would flash and it
24      would beep once?
0119
 1          A.    Yes.
 2          Q.    All right.  I'm going to play another
 3      portion that relates to unlocking, and I'll
 4      stop it in a moment and ask you another
 5      question.
 6
 7              (The following transcribed from the
 8               video that was played.)
 9
10              FEMALE VOICE:  To unlock the doors,
11      press the unlock button.  The hazard warning
12      lights will flash, the driver's door will
13      unlock.
14              Press again within one minute to
15      unlock all doors and the rear hatch and the
16      hazard indicator flashes again once.
17              When the unlock button on the
18      intelligent key is pressed, all doors will
19      automatically relock within one minute unless
20      any door is opened or you push the power
21      switch.
22              If you are near your vehicle --
23
```

0120
1      BY MR. PADOLSKY:
2           Q.    Did you hear that portion of the
3      video?
4           A.    I did.
5           Q.    That, for the record, was at 1:08 to
6      1:35 of the video.
7                 Does that accurately describe the way
8      that your vehicle was when you pressed the
9      unlock switch?
10          A.    I would say in the general vicinity,
11     but you also have to keep in mind that there
12     are different levels of this car.
13                You know, you have the one with full
14     - what do you call it - you have all - you have
15     it fully loaded, and you have some that are
16     basic.
17          Q.    I get it.  I'm just asking you if
18     what she just described, what the video just
19     described accurately describes the way that
20     your vehicle was when you pressed the unlock
21     switch?
22          A.    That it makes noise?
23          Q.    I'll play it again.  Hold on.
24          A.    Yes.
0121
1           Q.    Starting at 1:07, and I'm going to
2      stop it at 1:35 again.
3
4                      (The following transcribed from the
5                       video that was played.)
6
7                 FEMALE VOICE:  To unlock the doors,
8      press the unlock button.  The hazard warning
9      lights will flash, the driver's door will
10     unlock.
11                Press again within one minute to
12     unlock all doors and the rear hatch and the
13     hazard indicator flashes again once.
14                When the unlock button on the
15     intelligent key is pressed, all doors will
16     automatically relock within one minute unless
17     any door is opened or you push the power
18     switch.
19                If you are near --
20
21                      (End of video transcription.)
22
23     BY MR. PADOLSKY:
24          Q.    Were you able to hear that portion of
0122
1      the video?
2           A.    Yes.  I hear that portion of the
3      video.  That is correct.
4           Q.    Does that sound to be accurate in
5      terms of the way your Nissan LEAF unlocked when

```
 7        A.    I would say, yes.  But, you know,
 8   again, my key was in my pocket, and, you know,
 9   there is no - I've had the car for a while, and
10   it is - you know, when I unlock it, I go close
11   to the car and I open the door or do it from
12   the back.
13        Q.    But that does - that's the way that
14   your Nissan - your 2015 Nissan LEAF unlocked
15   when you pressed the unlock button?
16        A.    Yes.  If you press the unlock button,
17   the light comes off like it did in the video,
18   and you hear that tiny sound that I was
19   referring to earlier.
20              And, you know, that was - you know, I
21   only - to be honest with you, you see all of
22   the you can lock it from 15 miles away.  I was
23   just driving the car.  That's it, man.
24        Q.    I understand.  I'm trying to - I'm
0123
 1   just trying to understand your memory, and I'm
 2   trying to understand if this video helps to
 3   understand the manner in which the key fob
 4   works for the vehicle that you were driving at
 5   the time.
 6        A.    Oh, okay.  So there are two ways that
 7   we typically unlock my car, okay.  One, you go
 8   and I will use the key fob and click it to
 9   unlock.
10              The other was to have the key fob in
11   my pocket and just open the door.  It unlocks
12   that way, too.  You see what I mean?
13              So that is how I would typically open
14   it.  You know, I know initially when I got the
15   car I was more into how it worked.  But later I
16   just - it was just a car.  I didn't pay too
17   much attention to all the --
18        Q.    So your memory of July 7, 2016, was
19   that you used the unlock key fob button?
20        A.    Yes, I did.
21        Q.    And your memory is that you heard, I
22   think you just said, a tiny sound and some of
23   the lights?
24        A.    Hear the chirp, you know, when you
0124
 1   turn it on goes ch like that.  That's what I'm
 2   referring to as sound, you know.
 3        Q.    Are you talking about the sound of
 4   the doors actually unlocking?
 5        A.    Yes.  The unlock sound that comes on
 6   with the light.  You know, when you unlock it
 7   and you hear that ch and the light comes on.
 8   That is what I am referring to.
 9        Q.    Hold on one second.  I'm sorry.  The
10   video that I just played, you would agree that
11   that - the voice on the video said when you
12   press the lock button there is a chirp that
```

14        A.     Yes.  I hear what you're saying.
15        Q.     When you press the unlock button,
16   it's just the blinking light and no chirp?
17        A.     Yes.  That's what the video said.
18   But my car, you know, I don't know how they
19   design my - I would be pretty much close to it
20   for it to work.
21               You know, the dealership told me one.
22   In real life it was a little different.  You
23   know, any time I get a car they tend to play it
24   up more than - you know, of course, you know
0125
1    how the dealerships are.  The car doesn't
2    really fully to the design they tell you from
3    all the way to the range of the car.  You know,
4    it is a typical advertisement for cars.
5                But with my case, you have to unlock
6    it from a distance of this feet.  You've got to
7    get close to - initially it was like that.
8                But once it started getting over a
9    certain mileage, you have to get close to the
10   car.
11               It was not as initially as they say.
12   So on that day I had my key close to the car
13   like I explained to you, and I unlocked the
14   car.
15        Q.     And when you unlocked it, was it as
16   described in that video that I just played
17   when --
18        A.     The light came on and the chirp sound
19   was right there, yes.
20        Q.     You have a memory of a chirp sound?
21        A.     Yes.  It always happened when I did
22   it.
23        Q.     Okay.  And you said when you unlocked
24   it your key was still inside of your pocket?
0126
1    A.     Yes.
2        Q.     Okay.  Are you back to seeing me now?
3        A.     Yes.  Now I can see you.
4        Q.     How long in total was the interaction
5    that you had?
6        A.     I would put it at - I would put it at
7    five minutes, but it seems longer.
8        Q.     Did I hear you say "five minutes"?
9        A.     Yes.  When I was on the ground, yes.
10   But mind you, I wasn't really - I mean, if you
11   asked me for my memory, I would have tell you
12   it feels like forever.  So I wasn't keeping
13   track of time.  It just looks so long, you
14   know, so that's what I --
15        Q.     I want to show you one other screen
16   here.  Can you see the screen of the street of
17   Harvard Street?
18        A.     Yes.  That is correct.
19        Q.     And for the record, this is the

```
21      side of the screen at approximately a 30,
22      45-degree angle to the left is Harvard Court,
23      and the sign for Walgreens is approximately in
24      the center of the screen slightly off to the
0127
 1      right.  Does that sound like an accurate
 2      description to you?
 3          A.    Yes.
 4          Q.    And this area where my cursor is now
 5      where there is a woman standing with what looks
 6      to be a backpack on, that's Harvard Court,
 7      correct?
 8          A.    Correct, yes.  That's Harvard Court,
 9      correct.
10          Q.    Which tree were you standing at when
11      you were reading the news on your phone?
12          A.    So, you see, I was mostly on the
13      street.  When you move across the flowers - go
14      across.
15          Q.    Over here?
16          A.    Yes.  Inside, yes.  No, no, too far.
17          Q.    Too far?
18          A.    Yes.  So somewhere around there, yes,
19      that would have been where I was standing.
20      Close to that tree right there.  On the other
21      side of the flower where you go inside of the
22      parking lot.
23          Q.    Okay.  I just want to - for the
24      record, there is a streetlight in the center of
0128
 1      the screen, correct, with an American flag on
 2      the streetlight?
 3          A.    Yes.  From the picture, yes.  I can
 4      see that from here.
 5          Q.    And there is a tall brick pillar with
 6      a light on top of it, correct?
 7          A.    Yes, yes.
 8          Q.    And there is a tree behind that brick
 9      pillar, correct?
10          A.    Right.
11          Q.    And to the left of that tree, there
12      is a tree that is approximately three to four
13      car lengths away.  Do you see that?
14          A.    Yes, yes.  Okay.  The one that you
15      have your cursor on, yes.  I can see that.
16          Q.    That tree is the tree that you recall
17      you were reading the news at on your phone?
18          A.    Yes, yes.  So it would have been
19      moving forward to - yes, somewhere around
20      there, yes.
21          Q.    And you said you were against the
22      tree at the time?
23          A.    No, no.  I wasn't standing against
24      it.  I was just standing.  I was not leaning on
0129
 1      the tree.  I was standing around there.
```

```
 3         A.     Yes, near the tree.  So the reason I
 4   was standing, it was sunny, so I was using the
 5   tree shade to shade myself while I was under
 6   the tree.
 7         Q.     Were you on the - there is a row of
 8   bushes in front of the tree, correct?
 9         A.     Yes.
10         Q.     From our vantage point right now?
11         A.     Uh-huh.
12         Q.     And then there is the Harvard Court
13   paved street, right?  Oops, sorry.  There is
14   the Harvard Court paved street, right?
15         A.     Uh-huh, yes.
16         Q.     And then on the other side of the
17   bush is a row of cars, and that is the
18   Walgreens parking lot, right?
19         A.     Correct.
20         Q.     Were you on - which side of the
21   bushes were you on?
22         A.     On the side where you have the cars.
23         Q.     On the side of the cars?
24         A.     Yes.  That side, yes.
0130
 1         Q.     And were you standing on grass or the
 2   sidewalk or what is the --
 3         A.     On that side you have --
 4         Q.     You were standing on grass?
 5         A.     No, no.  Right outside of these
 6   flowers right here.  This.  There is no grass
 7   on the ground.  It's all paved.
 8         Q.     It's all paved?
 9         A.     Yes.  So I was standing on the
10   pavement, yes, at that time - at the time that
11   it happened.
12         Q.     And your vehicle was - how far away
13   from your vehicle were you at the time that you
14   were standing?
15         A.     So I would have been able to cross
16   from here.
17         Q.     Looking at the image, if it helps,
18   are you able to estimate the distance in feet
19   you were away from your vehicle?
20         A.     No, I can't, but it wasn't far.  It
21   was just crossing that, you know, where I
22   identified my vehicle was earlier.  I was
23   crossing over towards my vehicle.  I wouldn't
24   say it was that far.
0131
 1         Q.     I'm going to move this street view
 2   for you for a second.  Hold on a second.
 3                So I guess that's the best I'm going
 4   to get it here.  So for the record I've moved
 5   the Google street view a distance into Harvard
 6   Court, and we're looking at the tree in the
 7   center of the screen.
 8         A.     Yeah, yeah, I can see.
```

```
10        A.    Yes, standing close to, yes.
11        Q.    And you were standing - was there a
12   car parked in front of that tree like there is
13   in this image?
14        A.    No.   There was no car there.   Not
15   like this.  So there was enough space there
16   that I was able to stand there.
17        Q.    So you were on the parking lot side
18   standing underneath the shade of this tree that
19   we're looking at?
20        A.    Right.
21        Q.    How long were you standing there for?
22        A.    I really was not keeping time.
23        Q.    About how long?
24        A.    My estimate, I would have said less
0132
 1   than - it would have been less than ten
 2   minutes, but I don't know the exact time, but I
 3   didn't keep track.
 4        Q.    So less then ten minutes.  Would you
 5   say more than five minutes?
 6        A.    It could be between five and ten.
 7   Because I was reading on my phone, so it could
 8   be between five and ten.
 9        Q.    And then you said you went from - and
10   I'm moving the screen now, but you went from
11   that area.
12             I think what you described earlier is
13   your vehicle was parked somewhere off over
14   here?
15        A.    Yeah.  Around that block right there.
16        Q.    And for the record, that is - if
17   we're looking at the Walgreens from Harvard
18   Court, that's the second row of vehicles,
19   correct?
20        A.    So if we are counting by rows, it
21   would have been between not - it is not - it
22   would have been the third.  It would have
23   been --
24        Q.    The third --
0133
 1        A.    So I'm looking at this row, right,
 2   one, two, so it could have been third or fourth
 3   could have been more accurate.  My car would
 4   have been there.
 5        Q.    Okay.  Hold on.  So hold on one
 6   second.  So if this is the first row.  You see
 7   where I'm pointing the cursor?
 8        A.    Yeah.
 9        Q.    Right?  Here is your second row?
10        A.    Right.
11        Q.    Here is your third row --
12        A.    Okay.
13        Q.    -- where the red Jeep is.
14        A.    Uh-huh.
15        Q.    And the fourth row would be on the
```

17          A.      Right, right.
18          Q.      Your memory is that your car was
19     parked in the third or fourth row?
20          A.      Yes.  It would have been there,
21     correct.
22          Q.      So fair to say that you were - when
23     you were under the tree, you were at least -
24     let's see.  At least, I don't know, five, ten
0134
1      car lengths away from - somewhere around five
2      to ten car lengths away from your car?
3           A.      Yes.  It could be, but I wouldn't
4      know that.
5           Q.      I'm sorry?
6           A.      I wouldn't know that looking at the
7      pictures.  It could be.  You know what I mean?
8           Q.      That red Jeep, does that look to be
9      the area that your car was parked?
10          A.      So my car would not be on that red
11     Jeep.  My car would be on this side between -
12     yes.  The second car that you have it on right
13     here.  That one.
14          Q.      Yes.
15          A.      That one.  It could have been one of
16     these two spots.
17          Q.      Okay.  So the area of the minivan
18     here, this tan minivan, does that sound about
19     right?
20          A.      Yes, yes, that one or the one close
21     to it.
22                  MR. PADOLSKY:  Off the record for a
23     second.
24
0135
1                   (Discussion off the record.)
2
3      BY MR. PADOLSKY:
4           Q.      So, Mr. Ebowe, I'm showing you a
5      picture - screenshotted picture of the
6      Walgreens parking lot from Harvard Court,
7      correct?
8           A.      Yes.
9           Q.      And on the right side of that picture
10     is depicted the tree that you were standing at
11     reading the news, correct?
12          A.      Yes.
13          Q.      Correct?
14          A.      That is correct.
15          Q.      And earlier in your testimony you
16     referenced that your vehicle was parked
17     somewhere in the vicinity of the tan minivan
18     that I'm hovering the cursor over right now,
19     correct?
20          A.      Yes.
21                  MR. PODALSKY:  So at the conclusion
22     of the deposition, I'll forward a copy of this

24      Exhibit 1 to this deposition.  Agreed?
0136
 1                      MR. AMES:  Yes.
 2
 3                      (Exhibit No. 1, Screenshot of
 4                      Google Map street view, to be
 5                      marked at the conclusion of the
 6                      deposition.)
 7
 8                      MR. PADOLSKY:  Okay.  Just one
 9      moment.  Is it back on me?
10                      MR. AMES:  Yes.
11      BY MR. PADOLSKY:
12          Q.    A few other questions, Mr. Ebowe, and
13      then I think I'll be done.  You referenced or
14      you mentioned in your earlier testimony that
15      the officer's hand was on his gun, and that's
16      something that you have a memory of?
17          A.    Yes.
18          Q.    His gun was in his holster at the
19      time?
20          A.    Right.
21          Q.    It stayed in the holster the entire
22      time, correct?
23          A.    Yes.
24          Q.    You also said earlier that this -
0137
 1      something like this incident has never happened
 2      to you before?
 3          A.    Oh, yes, it hasn't.
 4          Q.    And that that is - that this has
 5      never happened to you anywhere?
 6          A.    Anywhere, including anywhere.
 7          Q.    You also said that you - when your
 8      lawyer filed the complaint with the Brookline
 9      Police Department, that your wife handled the
10      communications with the police department.  Did
11      I hear that right?
12          A.    Yes, she did.  She was very helpful.
13          Q.    And you don't have a good memory
14      sitting here of your interactions because of
15      that?
16          A.    I just got feedbacks, and I read
17      what was in --
18          Q.    Did you have any memory of personally
19      interacting with the police department?
20          A.    No.  I did not go to the police
21      department.  I couldn't do it.
22          Q.    What about phone calls or --
23          A.    No.
24          Q.    -- anything like that?
0138
 1          A.    No.  I just was too broken to deal
 2      with the police at that time.
 3          Q.    So fair to say that you in the
 4      process of this, of the investigation of your

```
 6    the Brookline Police Department?
 7        A.    No, I did not.
 8        Q.    You said also that your understanding
 9    of Brookline prior to this incident was that it
10    was a very progressive environment?
11        A.    Yes.
12        Q.    Could you elaborate on that?
13        A.    What I mean is Brookline is not an -
14    at least from my interaction with the town, it
15    was a neighborhood town politically - by my
16    understanding or my feeling was at least more
17    liberal.
18             And when I interact with people
19    there, they were very - when I say
20    "progressive," you know, what I'm talking about
21    is in terms of politically progressive, not
22    closed up.
23             And there was diversity in Brookline
24    to the extent that you have Boston College -
0139
 1    I'm sorry, Boston University campus around
 2    there.
 3             You know, and, you know, it is a lot
 4    of students, a lot of different ethnicity
 5    living in Brookline.
 6             Just walking down the street you see
 7    it.  So that would be different if I was in an
 8    area that is very secluded.
 9             So that is what I meant is that it
10    was very progressive.  A lot of students,
11    different ethnicity when you walk down the
12    street, and, you know, diversity present even -
13    you know, everything politically in Brookline
14    appears to be very progressive.
15             I'm talking about progressive in
16    terms of conservative and progressive.  So that
17    is when I mean.
18             So as - to be blunt, as a minority in
19    Brookline, I did not feel excluded.  You know,
20    I lived in Cambridge before.
21             I feel the same way when I was in
22    Cambridge, you see, because they were all
23    similar.  You know, you can see variety of
24    ethnicity in Brookline.  That's what I mean
0140
 1    when I say "progressive."
 2        Q.    Thank you.  And before the July
 3    incident, you had never experienced anything
 4    like the incident that occurred in July,
 5    correct?
 6        A.    No.  Absolutely.  I have never
 7    experienced anything like that.
 8        Q.    And you were working predominantly in
 9    Brookline for eight years by that point, right?
10        A.    Correct, yes.
11        Q.    And did I hear you right you said
```

13      A.      Yes.  I was totally shocked, yes.

14      Q.      You also - Attorney Ames had asked

15  you specifically about, I think, a letter that

16  your attorney drafted, and specifically about

17  the names of Dwaign Tyndal, Juana Baez,

18  Demetrius Oviedo, and Deon Fincher.

19              And I think earlier you had said that

20  before reading that letter and having

21  discussions with your attorney, you were

22  unaware of those incidents?

23      A.      That is correct.

24      Q.      And that it was shocking for you to

0141

1   have read those as well?

2       A.      Yes.

3               MR. PADOLSKY:  Okay.  Give me a

4   moment.  I don't think I have any other

5   questions for you.

6               That's all I have.  Thank you, sir.

7               MR. AMES:  Thank you very much, Mr.

8   Ebowe.

9               MR. DOWNEY:  Thank you very much.

10              THE COURT REPORTER:  Attorney

11  Downey, do you want a transcript?

12              MR. DOWNEY:  Yes, please.

13              THE COURT REPORTER:  E-mail PDF or

14  did you want a hard copy?

15              MR. DOWNEY:  E-mail PDF is fine.

16              THE COURT REPORTER:  Mr. Padolsky,

17  do you want a transcript?

18              MR. PADOLSKY:  We represent the

19  same defendants.

20              THE COURT REPORTER:  Attorney Ames,

21  do you have a standing order?

22              MR. AMES:  Yes.

23

24

0142

1

2               (Whereupon at 1:20 p.m. the

3               deposition concluded.)

4

5               (Exhibit No. 1, Screenshot of

6               Google Map street view officially

7               marked.)

8

9

10

11

12

13

14

15

16

17

18

```
20
21
22
23
24
0143
 1                C E R T I F I C A T E
 2
 3     COMMONWEALTH OF MASSACHUSETTS
 4     COUNTY OF MIDDLESEX, ss.
 5
 6          I, Shannon M. Crowley, Registered
 7     Professional Reporter and Notary Public in and
 8     for the Commonwealth of Massachusetts, do
 9     hereby certify that the foregoing transcript of
10     the deposition of Isa Ebowe, having been duly
11     sworn on April 17, 2020, is true and accurate
12     to the best of my knowledge, skill, and
13     ability.
14          In witness whereof, I have hereunto set
15     my hand and seal this 23rd, day of April, 2020.
16
17
18
19
20
                        _____
21                      Shannon M. Crowley, RPR, CSR
                        Notary Public
22
23
24     My commission expires: March 2, 2023
0144
 1     DEPONENT'S ERRATA SHEET
       AND SIGNATURE INSTRUCTIONS
 2
 3
       The original of the Errata Sheet has been
 4     delivered to Brooks Ames, Esq.
       When the Errata Sheet has been completed by the
 5     deponent and signed, a copy thereof should be
       delivered to each party of record and the
 6     ORIGINAL delivered to Brooks Ames, Esq., to
       whom the original deposition transcript was
 7     delivered.
 8
 9     INSTRUCTIONS TO DEPONENT
11
       After reading this volume of your deposition,
12     indicate any corrections or changes to your
       testimony and the reasons therefor on the
13     Errata Sheet supplied to you and sign it. DO
       NOT make marks or notations on the transcript
14     volume itself.
15
16
```

```
18
19
20
21
22
23
24
0145
1      REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
       COMPLETED AND SIGNED ERRATA SHEET WHEN
2      RECEIVED.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
0146
1          ATTACH TO THE DEPOSITION OF ISA EBOWE
                      ERRATA SHEET
2
       INSTRUCTIONS:  After reading the transcript of
3      your deposition, note any change or correction
       to your testimony and the reason therefor on
4      this sheet.  DO NOT make any marks or notations
       on the transcript volume itself.  Sign and date
5      this errata sheet (before a Notary Public, if
       required).  Refer to Page 145 of the transcript
6      for errata sheet distribution instructions.
7
8
9
10
11
12
13
14
15
16
17
```

```
19
20
21
22
23
24
0147
 1     PAGE          LINE
       _____
 2     _____CHANGE:_____
 3     REASON:_____
       _____
 4     _____CHANGE:_____
 5     REASON:_____
       _____
 6     _____CHANGE:_____
 7     REASON:_____
       _____
 8     _____CHANGE:_____
 9     REASON:_____
       _____
10     _____CHANGE:_____
11     REASON:_____
       _____
12     _____CHANGE:_____
13     REASON:_____
       _____
14     _____CHANGE:_____
15     REASON:_____
       _____
16     _____CHANGE:_____
17     REASON:_____
       _____
18     _____CHANGE:_____
19     REASON:_____
       _____
20     _____CHANGE:_____
21     REASON:_____
       _____
22     _____CHANGE:_____
23     REASON:_____
24
0148
 1          I have read the foregoing transcript of
       my deposition and except for any corrections or
 2     changes noted above, I hereby subscribe to the
       transcript as an accurate record of the
 3     statements made by me.
 4
       _____
 5          ISA EBOWE              DATE
 6
 7
 8
 9
10
```

12
13
14
15
16
17
18
19
20
21
22
23
24