# United States Court of Appeals
## For the First Circuit

No. 21-1278

JUANA BAEZ, individually and on behalf of all others similarly situated; CRUZ SANABRIA, individually and on behalf of all others similarly situated; ROGELIO RODAS, individually and on behalf of all others similarly situated; DEMETRIUS OVIEDO, individually and on behalf of all others similarly situated; JOSE ALBERTO NUNEZ-GUERRERO, individually and on behalf of all others similarly situated,

Plaintiffs, Appellants,

v.

TOWN OF BROOKLINE, MASSACHUSETTS BROOKLINE POLICE COMMISSIONERS,

Defendant, Appellee,

NEIL WISHINSKY, in his individual and official capacities; NANCY DALY, in her individual and official capacities; BEN FRANCO, in his individual and official capacities; NANCY HELLER, in her individual and official capacities; BERNARD GREENE, in his individual and official capacities,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Kayatta, Lipez, and Gelpí, Circuit Judges.

Brooks A. Ames, with whom Brookline Justice League was on brief, for appellants.

Joseph A. Padolsky, with whom Michael Downey, Douglas I. Louison, and Louison, Costello, Condon & Pfaff, LLP were on brief, for appellee.

---

August 11, 2022

---

KAYATTA, **Circuit Judge**.  The five named plaintiffs in this case argue that between 2014 and 2015, the Brookline police violated plaintiffs' rights under the Fourteenth Amendment's Equal Protection Clause by treating them differently because they are Hispanic.  Rather than suing any of the individual officers, plaintiffs pursued claims against the Town of Brookline and its Selectmen (who are also the Town's Police Commissioners). Plaintiffs say that the Town caused their allegedly unconstitutional mistreatment by its "deliberate indifference" to complaints of racial discrimination by Brookline police.  In granting summary judgment in favor of all defendants, the district court found that the record would not allow any reasonable jury to conclude that the Town of Brookline was deliberately indifferent to complaints of unlawful discrimination by police officers.  Baez v. Town of Brookline, No. CV 17-10661, 2021 WL 1209743, at *3 (D. Mass. Mar. 31, 2021).[1]  For the following reasons, we agree.

**I.**

We review the entry of summary judgment de novo.  Alston v. Town of Brookline, 997 F.3d 23, 35 (1st Cir. 2021).  In so doing, "we evaluate the facts of record in the light most

---

[1] Because plaintiffs did not appeal the lower court's judgment regarding the individual defendants, the individual defendants are not parties to this appeal.  Further, because no class was certified below, we use "plaintiffs" to mean only the named plaintiffs (the appellants before us).

flattering to the nonmovant[s]" -- here, plaintiffs -- "and draw all reasonable inferences in [their] favor." Id. Summary judgment is warranted only if, after reviewing the record in the manner just described, we determine "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id.

## II.

We begin with a review of the applicable law. To prevail in this action against a municipality under 42 U.S.C. § 1983, plaintiffs must prove that they suffered a violation of a constitutional right as a result of a "policy or custom" of the Town of Brookline. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). In plaintiffs' favor, we will assume without deciding that a jury could reasonably find that Brookline police officers violated plaintiffs' equal-protection rights. We train our attention, instead, on whether the evidence would support a finding that those (assumed) constitutional violations were the result of an official policy or custom.

Not surprisingly, there is no evidence that the Town has a formal or express policy instructing police officials to discriminate based on race or ethnicity. But "[o]fficial municipal policy" need not be so explicit -- it also includes, inter alia, "the acts of [a government's] policymaking officials[] and practices so persistent and widespread as to practically have the

force of law." Connick v. Thompson, 563 U.S. 51, 60-61 (2011). Put another way, a municipality can be held liable if an unlawful "custom or practice" is "'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.'" Whitfield v. Meléndez-Rivera, 431 F.3d 1, 13 (1st Cir. 2005) (quoting Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989)). Thus, "[i]n limited circumstances," a municipality's decision not to act "may rise to the level of an official government policy for purposes of § 1983." Connick, 563 U.S. at 61 (discussing "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights").

Pointing to these principles, plaintiffs in this case seek to establish liability by showing that they suffered constitutional injury as "the direct result of poor . . . supervision of" Brookline police officers, "stemming from 'deliberate indifference to the rights of persons with whom the [police] come into contact.'" Jones v. City of Boston, 752 F.3d 38, 59 (1st Cir. 2014) (quoting Hayden v. Grayson, 134 F.3d 449, 456 (1st Cir. 1998)). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Connick, 563 U.S. at 61 (cleaned up) (quoting Bd. of Comm'rs v.

Brown, 520 U.S. 397, 410 (1997)).  "A showing of simple or even heightened negligence will not suffice."  Brown, 520 U.S. at 407.

To make this required showing of deliberate indifference, plaintiffs advance a single argument on appeal:  "The Town's failure to take meaningful action to independently investigate racial discrimination complaints and impose appropriate discipline on offending officers constitutes deliberate indifference to racial discrimination."  See Fiacco v. City of Rensselaer, 783 F.2d 319, 331–32 (2d Cir. 1986) (inadequate handling of complaints against police could permit a rational juror to find "a policy of nonsupervision . . . that amounted to a deliberate indifference").  Plaintiffs allege that by failing to properly address complaints, the Town "turned a blind-eye" to "a pattern of discriminatory behavior" and "tacitly encouraged" discriminatory police conduct.  Plaintiffs further argue that but for the Town's deficient handling of racial discrimination complaints, plaintiffs would not themselves have suffered constitutional injury by Brookline police officers.  Plaintiffs focus in particular on the actions of the Police Commissioners, who we will assume are policymaking officials for the purposes of section 1983 liability.

Plaintiffs are correct that "deliberate indifference may be inferred" if a municipality receives "repeated complaints of civil rights violations . . . followed by no meaningful attempt on

- 6 -

the part of the municipality to investigate or to forestall further incidents." Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995); see also Harris v. City of Pagedale, 821 F.2d 499, 506 (8th Cir. 1987) (finding deliberate indifference where "[c]ity officials in positions of authority and responsibility were notified of" sexual misconduct by police officers "on repeated occasions" but "repeatedly failed to take any remedial action"). Taking nominal action will not shield a local government from liability. See Beck v. City of Pittsburgh, 89 F.3d 966, 974 (3d Cir. 1996) ("[W]e cannot look to the mere existence of superficial grievance procedures as a guarantee that citizens' constitutional liberties are secure."). Deliberate indifference can be predicated on actions shown to be "meaningless or blatantly inadequate." Reynolds v. Giuliani, 506 F.3d 183, 196 (2d Cir. 2007) (discussing deliberate indifference in the context of supervisory liability). That said, responsive measures do not necessarily establish deliberate indifference just because they ultimately prove ineffective. See Doe ex rel. Doe v. Dallas Indep. Sch. Dist., 153 F.3d 211, 219 (5th Cir. 1998) (explaining, in the context of individual liability, that "[a]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference").

## III.

Having explained the applicable law, we turn to evaluating whether plaintiffs' evidence might suffice to establish municipal liability under that law.  More specifically, we look to the Town's handling of relevant complaints (formal and otherwise) during the years surrounding plaintiffs' interactions with Brookline police to discern whether the Town's actions could support a finding of deliberate indifference.

### A.

Plaintiffs' own relevant interactions with Brookline police occurred in 2014 and 2015.[2]  Those interactions led three plaintiffs to file complaints against Brookline police officers.  The Police Department's procedures for handling such complaints track their relevant origins to 2008, when the Town's Board of Selectmen charged a committee with reviewing the Police Department's then-existing complaint procedures and recommending improvements.  This review was prompted by a contentious incident at Town Hall the previous year, which led to a complaint alleging racial discrimination by Brookline police officers.  The nine-member review committee was chaired by Patrick J. King, a member of the Massachusetts State Ethics Commission who had been a trial attorney in the Civil Rights Division of the U.S. Department of

---

[2]  We confine our analysis to those interactions described in plaintiffs' opening brief as the basis for their claims on appeal.

Justice before serving as a superior court judge and working in alternative dispute resolution.  The committee met eleven times in as many months, holding two meetings for public comment.  One committee member wrote that "in over 30 years of community involvement, [he] recall[ed] no committee more willing to hear from the public."  The committee also heard from experts, who underscored the importance of using procedures to "compensate for the reality" that "[i]n all police jurisdictions[,] the internal dynamic leans in favor of the police."  The committee ultimately recommended various reforms, and the Town revised its complaint procedures in response.

As best we can tell, the undated complaint procedures included in the addendum to plaintiffs' opening brief were the operative Police Department procedures at the time plaintiffs submitted their complaints.  Those procedures allow a person to submit complaints in person, online, or by telephone -- anonymously, if desired.  Complaints are ordinarily to be investigated in the first instance by an Internal Affairs/Staff Inspection Officer.  The procedures outline the time frame in which the investigator should commence work on a given complaint.  They require an investigator to "make reasonable attempts to interview" witnesses, "assist[] both complainants and officers in identifying and locating evidence to corroborate their factual assertions," and "maintain[] thorough records."  Unless a witness provides a

statement on her own, she should be asked to sign her statement or a summary thereof. When complete, the investigator's report is to be furnished to the complainant and the subject officer and reviewed by the Chief of Police. The Chief is then to prepare her own report (after further investigation, if she requests it) for transmittal to the Selectmen, the complainant, and the subject officer. A complainant can appeal for review by the Selectmen, triggering a pre-hearing review by the Town Administrator.

Plaintiffs nevertheless complain that the Police Department's procedures employ no mechanism for review by any outside or independent person or tribunal. There are several problems with this argument. First, plaintiffs cite no rule, regulation, or case law indicating that a town is deliberately indifferent whenever it fails to employ independent civilians to review complaints of discriminatory policing -- and we are not prepared to endorse such a categorical rule. Second, the Town does provide for independent review of the Police Department's findings: If a complainant appeals the disposition of her complaint against an officer, the Selectmen may appoint "one or more independent persons to conduct an investigation and write a report for the Selectmen." Further, the Town provides for a

biennial assessment of the Department's complaint procedures to be conducted by the Police Chief and two civilians.[3]

In sum, we see no basis on which a reasonable jury could find that the Town's complaint procedures as written evidence deliberate indifference to the possibility of discrimination by Brookline police.  To the contrary, the procedures -- at least on paper as set forth in the record -- suggest that the Town took meaningful steps to respond to complaints of discriminatory conduct.

**B.**

To be sure, the fact that Brookline has on paper a procedure for handling complaints lodged with the Police Department leaves open the possibility that, in practice, its investigations are flawed and subsequent reviewers merely rubber-stamp initial police findings of no misconduct.  And such a sham is more or less what plaintiffs claim Brookline's procedures to be.  So we turn to the evidence of how the Town responded to complaints of discriminatory policing, beginning with plaintiffs' own charges of improper police conduct.

**1.  Cruz Sanabria**

Sanabria's claim stems from police involvement in a series of disputes between Sanabria and his white neighbors.  On

---

[3]  The first assessment occurred in 2014; the second was delayed to 2017.

March 28, 2014, Sanabria called the police after his neighbors allegedly placed trash barrels around his car. Sanabria laments that although responding officers "took a report," "nothing was done." The same was apparently true when one of Sanabria's neighbors called the police on August 27, 2014, alleging that Sanabria had damaged her bicycle; the police determined that no crime had occurred and did not inform Sanabria of the accusation.

Three months later, one of Sanabria's neighbors alleged that Sanabria closed the basement door while she was on the basement stairs, causing her to fall down the stairs. This time, Sanabria was told to appear at a police-initiated hearing before a clerk-magistrate to determine whether there was probable cause to charge Sanabria with assault with a dangerous weapon. The clerk-magistrate determined that no probable cause existed.

Sanabria and his counsel met with Town officials in February 2015. Several months later, Sanabria lodged a more formal complaint, which the Town described as alleging racial profiling. The lieutenant looking into Sanabria's case had attended the February meeting with Sanabria and his counsel. He considered the officer's recent history of similar complaints (there evidently were none), visited the scene of the incident, and spoke to non-police witnesses. He tried to schedule an interview with Sanabria, offering to meet him at a location of Sanabria's choosing. But Sanabria declined to be interviewed and said that his complaint

- 12 -

also concerned the Town's conduct around the February meeting.
After the investigating lieutenant recommended finding Sanabria's
complaint to be unfounded, Sanabria initially exercised his appeal
right.  The Town retained Charles E. Walker, Jr. -- a former chair
of the Massachusetts Commission against Discrimination -- to act
as a hearing officer for Sanabria's appeal.  Sanabria through
counsel objected to the use of an outside hearing officer and
refused to pursue the appeal.

### 2.  Demetrius Oviedo

Oviedo and his brother were arrested by Brookline police
while walking home in the early morning hours of November 8, 2014.
The brothers were with a friend, who Oviedo testified had stopped
to urinate in public as the brothers kept walking.  Oviedo
maintained that the brothers were stopped by a Brookline police
officer in plain clothes, who demanded Oviedo's identification.
According to Oviedo, after he asked why the man needed to see his
identification, the officer called for backup.  Oviedo said that
his brother "got a little loud" and was arrested.  Oviedo relayed
that he stepped towards his brother and, after initially declining
to get down as requested, was arrested himself.  The friend, who
was also Hispanic, was not arrested.[4]

---

[4]  The officers evidently did not realize that the friend was
the one who had urinated in public.

Oviedo was charged with disorderly conduct, resisting arrest, and assault and battery on a police officer.  All of those charges were dismissed, and Oviedo paid court costs.  Oviedo did not file a complaint as a result of this incident.

### 3.  Alberto Nunez-Guerrero and Juana Baez

On August 15, 2015, Nunez-Guerrero brought groceries to Baez, with whom he has two children.  He drove Baez's car.  When he arrived, he parked next to the building while he took the groceries up to Baez.  The parties dispute how long he was away from the car.  But by the time he returned, a tow truck had arrived, and its white driver had begun to tow Baez's car.  Nunez-Guerrero jumped onto the tow truck to prevent the driver from leaving with Baez's car, then called the police.  While officers were en route to the scene, a dispatcher told them that a man was jumping on, punching, and slamming the tow truck.

As Nunez-Guerrero and the tow-truck driver exchanged words, Baez came downstairs and joined the verbal altercation. Baez alleges that the tow-truck driver nearly hit her with the truck's door while she was holding her newborn.

Brookline police officers arrived at the scene, finding Nunez-Guerrero still standing on the truck.  One officer directed Nunez-Guerrero to come down.  He complied and was handcuffed. Nunez-Guerrero alleges that another officer told him, "Do not speak Spanish, or I'm going to put more charges."  Baez testified that

an officer asked her if she understood English and directed her to go get her passport or other identification.

Nunez-Guerrero was charged with malicious destruction of property and being a disorderly person.  The first charge was dismissed and Nunez-Guerrero was acquitted of the second.  Baez was charged with disorderly conduct, but the charge was dismissed upon payment of court costs.[5]

Nunez-Guerrero did not file a complaint as a result of the incident.  Baez did, and the Town described her complaint as alleging racial profiling and rudeness/discourtesy.  The Town Administrator promptly replied, explaining:

> [Y]our complaint has been forwarded to the Police Department's Internal Affairs Office for review and processing in accordance with the Town of Brookline's Citizen Complaint Procedures.  A copy of these Procedures is attached.  I have also enclosed a copy of the Town's Diversity, Inclusion and Community Relations By-law; and encourage you to consider contacting the Department's Director, Dr. Lloyd Gellineau, who will provide you with information and guidance should you find that helpful.[6]

------

[5]  The police also notified the Department of Children and Families about Baez's decision to bring her infant downstairs with her while she argued with the tow-truck driver, leaving her three-year-old child unattended upstairs.

[6]  The Town's Commission for Diversity, Inclusion and Community Relations is evidently empowered to receive and investigate complaints against the Town and its employees "concerning allegations of discrimination or bias."  Town of Brookline Gen. By-Laws, art. 3.14, § 3.14.3.  However, the Town does not indicate when the Commission's complaint procedures took effect, and it appears that they were in development as of mid-December of 2015, by which time Sanabria, Rodas, and Baez had

- 15 -

A Brookline police lieutenant was assigned to investigate Baez's complaint. He described receiving "a complete lack of cooperation" from Baez and Nunez-Guerrero despite, "[o]n numerous occasions[,] . . . request[ing] and attempt[ing] to meet with them for the purpose of interviewing them and obtaining information which [he] thought would be relevant to the investigation." Nevertheless, the officer visited upwards of thirty residences to look for witnesses, ultimately securing the accounts of at least eight people. He examined photographs taken on the day of the incident and considered the involved officers' past history of complaints. And he lamented his inability to follow up on one of Baez's allegations (about her first attempt to file a complaint) without her cooperation, because he opined that "it would be of great concern" if it had occurred.

The investigating officer ultimately recommended finding Baez's complaint to be unfounded. Baez initially exercised her appeal right, but then (through counsel) objected to the Town's proposed procedures and did not schedule an appeal.

### 4. Rogelio Rodas

Rodas's claims stem from a police encounter on October 9, 2015. Rodas was driving home when he noticed

---

already lodged complaints through the Police Department's procedures.

construction cones blocking the entrances to his building's parking lot. Rodas asked a nearby police officer if he could move the cones; the officer allegedly ignored and then rebuffed him. Rodas said that he "grabbed" two cones and "threw them on the side of the sidewalk" so he could proceed to park. After that, the officer allegedly grabbed Rodas and threatened to "shove [the cones] up Rodas's ass" if Rodas did not replace them.

Rodas filed a complaint about his treatment. Rodas did not allege racial discrimination at that time. After initially cooperating with the Town's investigation of his complaint, Rodas declined to participate in a second interview. Nevertheless, investigating officers reviewed video footage of Rodas's police encounter and sought out non-police witnesses identified by Rodas. Although the lieutenant who submitted the findings did not think the officer's behavior "[rose] to the level of formal misconduct," he found "elements of what happened" to be "concerning" and recommended "referr[ing]" the matter to the officer's "supervisor for counselling on better ways to handle [such] situations." The lieutenant recommended a finding of "[u]nfounded" for Rodas's allegation of excessive force and "[n]ot sustained" for his allegation of discourtesy. Rodas failed to appeal the disposition of his complaint.

## 5.  Other Individuals

Plaintiffs also allege deficiencies in the Town's handling of other allegations of racial discrimination since 2008 in which plaintiffs were not involved.[7]  Plaintiffs rely in part on a 2017 review conducted by two civilians (including the chair of the Town's Commission for Diversity, Inclusion and Community Relations) tasked with reviewing the Town's handling of complaints for the period from 2013–2016.  The resulting report identified a total of eleven allegations of racial profiling (comprising 14.9% of all allegations contained in the forty-one complaints reviewed).  In its recommendations, the report stated that "not all complainants making appeals to the Select Board were granted the right to be heard by the Select Board or were granted the right in a timely manner."  The same report concluded that "most complaints were investigated and reviewed in a fair, thorough, and impartial manner," stating that, in the reviewers' judgment, "each complaint was taken seriously, with a thorough investigation of each complaint."  Nonetheless, the report noted "a few cases" in

---

[7]  Given that all plaintiffs' claims on appeal arose in 2014 or thereafter, we do not discuss events alleged to have occurred prior to the 2008 review of the Police Department's complaint procedures.

which "actions by the police or others have led to dissatisfaction with the process and criticism by complainants."[8]

Plaintiffs also point to an investigation conducted in 2017, when counsel for Isa Ebowe, a Black man, sent a letter alleging that Detective David Wagner racially profiled Ebowe during a stop in Brookline and used excessive force against him.[9] Ebowe's claims were investigated by Lieutenant Paul Campbell, who had also worked on the investigations of the Sanabria and Rodas complaints. Campbell tried unsuccessfully to locate video footage of the incident, including by arranging for a forensic video analyst to examine a nearby clinic's security system. Through counsel, Ebowe declined to be interviewed. Campbell noted two

---

[8] Plaintiffs also discuss the handling of specific complaints from 2011 and 2015. But they offer no evidence that those complaints were not subject to either the review discussed above or the prior review conducted in 2014 (which covered complaints registered in 2011, 2012, and 2013). And they develop no argument that those periodic reviews were themselves a sham.

[9] Although evidence of events that occurred after plaintiffs' police encounters and after the Town handled their complaints cannot establish causation in plaintiffs' cases, it might conceivably be "relevant to whether [the Town] was deliberately indifferent to a continued pattern of police misconduct." Forrest v. Parry, 930 F.3d 93, 115 (3d Cir. 2019) ("Although the failure to investigate [subsequent] complaints could not have caused Forrest's alleged injuries . . . . Camden's handling of complaints after Forrest's arrest is highly relevant to demonstrating that it maintained the same practice prior to and at the time of said arrest."); see also Foley v. City of Lowell, 948 F.2d 10, 14 & n.3 (1st Cir. 1991) (in a section 1983 case, "actions taken subsequent to an event are admissible if, and to the extent that, they provide reliable insight into the policy in force at the time of the incident").

prior complaints of racial profiling against Wagner. Unaided by cooperation from the complainant, Campbell determined that Wagner had violated a policy requiring documentation of the incident, but otherwise concluded that the evidence did not support Ebowe's claims of excessive force and racial profiling.[10] Plaintiffs allege that the Selectmen "accepted the department's findings clearing [Wagner] of wrongdoing." But Campbell's initial report on the case noted that the matter remained open and was being reviewed by Town Counsel. The Town ultimately reached a $157,000 settlement agreement with Ebowe. Without admitting liability, the Town agreed that the Police Department would work with the Anti-Defamation League to provide training on implicit bias. In a subsequent deposition, Selectman Greene noted that he thought implicit bias had played a role in Wagner's interaction with Ebowe. Wagner was required to undergo training as a result of his

---

[10] Plaintiffs suggest that Campbell displayed pro-police bias by probing aspects of Ebowe's past that plaintiffs evidently consider irrelevant, including past insurance claims. But Ebowe claimed to have incurred medical expenses as a result of his encounter with Wagner, and plaintiffs do not explain why an impartial investigator would not be entitled to assess Ebowe's credibility, including by researching past insurance claims. And to the extent that plaintiffs fault the Town for not "provid[ing] the Ebowe complaint to the reviewers who conducted the 2013-2016 review of the Citizen Complaint Procedures," they do not address Campbell's testimony that Ebowe never filed a formal complaint. Nor do they explain why Campbell's investigation of allegations received by the Town in January 2017 should have been reviewed during an assessment of "complaints received in 2013, 2014, 2015, and 2016."

encounter with Ebowe, though the Town does not specify the nature of that training. Wagner was not involved in any of the incidents involving plaintiffs.

Plaintiffs also fault the Town for not following up on allegations of police harassment made by Dwaign Tyndal during a meeting of the Commission for Diversity, Inclusion and Community Relations. The meeting transcript indicates that the committee's chairperson pointed out to Tyndal several avenues for filing a complaint. Plaintiffs are silent as to whether Tyndal did so.

**c.**

The foregoing provides no meaningful support for the contention that the Town employed its complaint procedures as a sham. Viewing the record generously to plaintiffs, they have unearthed a few shortcomings in the handling of particular complaints (not all of which seem to have involved racial discrimination) over the course of seven years. Placing these facts in context, no reasonable jury could say that the Town made "no meaningful attempt . . . to investigate or to forestall" racially discriminatory policing. Vann, 72 F.3d at 1049.

Further, we cannot agree that jurors could reasonably find that the Town merely rubber-stamped police conduct. The record shows that, in many cases, the complainants were unwilling to participate in the complaint review process. We have no occasion to doubt that in some instances, the complainants' prior

experiences in Brookline or elsewhere may have led them to distrust the police or other Town officials. But one cannot prove a town deliberately indifferent to complaints of police misconduct by failing to cooperate with investigations and not availing oneself of meaningful procedures for appealing decisions.

Moreover, while plaintiffs disagree with the outcomes of their individual investigations, they do not produce evidence showing that those investigations were plagued by the kind of systemic deficiencies that would allow a reasonable jury to find that the Town had a policy of deliberate indifference towards complaints of discriminatory police behavior.

To be sure, plaintiffs point to testimony by several Town officials who could not recall an instance when the Police Department sustained an allegation of racial discrimination. But to turn this assertion into evidence that would support a finding of deliberate indifference, plaintiffs would need to show that during the relevant time period, the Town's policy or custom was to ignore such complaints or to subject them to sham reviews. And, as demonstrated by the evidence we have discussed (including the apparently common practice of counseled claimants to refuse to cooperate fully with Town investigations), no such showing is possible on this record.

**IV.**

We add a coda prompted by charts in the fact section of plaintiffs' opening brief purporting to show a correlation between race and the arrest rates of Brookline residents.  Plaintiffs devote little argumentation to this data.  They suggest in passing that a jury might view the data "as placing the Town on notice of a pattern of racially discriminatory policing" and "add[ing] credence to . . . claims of racial discrimination."  For several reasons, the data does little to advance plaintiffs' theory on appeal.

First, the provenance of the data is unclear.  It appears that counsel created the charts.  But counsel has not described where to find all of underlying data, and we cannot tell where some of the figures come from.  It does appear that no attempt was made to account for possible confounding factors, such as age.

Second, plaintiffs "proffer[] no expert testimony or other insights to show the probativeness of the figures" or "their likely statistical significance."  <u>Mack</u> v. <u>Great Atl. & Pac. Tea Co.</u>, 871 F.2d 179, 184 (1st Cir. 1989); <u>see also, e.g.</u>, <u>Bos. Parent Coal. for Acad. Excellence Corp.</u> v. <u>Sch. Comm. of City of Bos.</u>, 996 F.3d 37, 46 (1st Cir. 2021) ("A party claiming a disparate impact generally does not even get to first base without" "evidence establishing that [the disparity at issue] is statistically

significant"). As a result, the ability to draw an inference of any causal relationship is undercut.

Finally, and most fundamentally, plaintiffs' claims on appeal fall short of the mark even if we read the data as plaintiffs do. That is because proving discrimination by Brookline police would not prove that the Town was deliberately indifferent to complaints of such conduct.

Whatever one might say of the Town's response to complaints of racial bias in law enforcement, no reasonable jury could view this record as showing that the Town was deliberately indifferent to allegations of discriminatory policing. In addition to maintaining a carefully considered process for investigating and adjudicating complaints lodged with the Police Department, the Town has provided its police officers with programming on racial profiling and hate crimes; published annual reports on the demographics of police encounters; and created a Commission for Diversity, Inclusion and Community Relations with its own complaint procedures. The plaintiffs have not put forward evidence from which a reasonable factfinder could conclude that the Town's formally established, multifaceted approach to preventing, detecting, and investigating racial discrimination by police was merely a sham.

**V.**

      For the foregoing reasons, the district court's order granting summary judgment for the Town is <u>affirmed</u>.